# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Brook Mallak,                                        Civil No. 13-2119 (DWF/LIB)

          Plaintiff,

v.                                                   **MEMORANDUM**
                                                     **OPNION AND ORDER**

City of Brainerd; Cass County; Crow Wing County;
City of Fridley; Central Minnesota Community
Corrections; City of Staples; City of St. Cloud;
City of Staples; Chad Visser, acting in his
individual capacity as an Officer of the Baxter
Police Department; Julie McCullough, acting in
her individual capacity as an employee of the
Brainerd Police Department; Joel Reed, acting
in his individual capacity as an Officer of the
Brainerd Police Department; Anthony Runde,
acting in his individual capacity as an Officer
of the Brainerd Police Department; Perry Jones,
acting in his individual capacity as a Detective
for the Fridley Police Department; David Darling,
acting in his individual capacity as an Officer of
the St. Cloud Police Department; Tyler Burke,
acting in his individual capacity as an employee
of the Crow Wing County Sheriff's Office;
Amy Edberg, acting in her individual capacity
as an employee of the Crow Wing County
Sheriff's Department; Ryan Goff, acting in his
individual capacity as a corrections officer for
the Crow Wing County Sheriff's Office and in
his individual capacity as an Officer of the City
of Staples Police Department; Gary Gutenkauf,
acting in his individual capacity as an Officer of
the Crow Wing County Sheriff's Office; Ginger
Heurung, acting in her individual capacity as a
corrections officer for the Crow Wing County
Sheriff's Office; Derek Lavoy, acting in his
individual capacity as an investigator for the
Crow Wing County Sheriff's Office; Deb Nelson,
acting in her individual capacity as an employee of

the Crow Wing County Attorneys' Office; Illissa
Ramm, acting in her individual capacity as an
Assistant County Attorney in the Crow Wing
County Attorney's Office; Michael Tripplet,
acting in his individual capacity as a corrections
officer for the Crow Wing County Sheriff's
Office; Karri Turcotte, acting in her individual
capacity as an employee of the Crow Wing
County Sheriff's Office; Jon Vukelich, acting
in his individual capacity as a Sergeant of the
Crow Wing County Sheriff's Office; Ryan
Barnett, acting in his individual capacity as an
employee of Central Minnesota Community
Corrections; Dawn Chouinard, acting in her
individual capacity as an employee of Central
Minnesota Community Corrections; Shannon
Wussow, acting in her individual capacity as an
employee of Central Minnesota Community
Corrections; Colleen Berens; Laura Johnson;
Christine Madsen; Joan Smith; John and Jane
Does (1 - 500) acting in their individual capacity
as supervisors, officers, deputies, staff, investigators,
employees or agents of the other law-enforcement
agencies; and Entity Does (1-50) including cities,
counties, municipalities, and other entities sited in
Minnesota and federal departments and agencies,

                    Defendants.

---

Jonathan A. Strauss, Esq., Lorenz F. Fett, Jr., Esq., Sonia L. Miller-Van Oort, Esq., and
Robin M. Wolpert, Esq., Sapientia Law Group PLLC, counsel for Plaintiff.

Jon K. Iverson, Esq., Susan M. Tindal, Esq., and Stephanie A. Angolkar, Esq., Iverson
Reuvers Condon, counsel for Defendants City of Brainerd, City of Fridley, City of St.
Cloud, City of Staples, Chad Visser, Julie McCullough, Joel Reed, Anthony Runde, Perry
Jones, and David Darling.

Erin E. Benson, Esq., Margaret A. Skelton, Esq., and Timothy A. Sullivan, Esq., Ratwik,
Roszak & Maloney, PA, counsel for Defendants Cass County, Crow Wing County, and
Central Minnesota Community Corrections.

Jason M. Hill, Esq., Jardine, Logan, & O'Brien, P.L.L.P., and Margaret A. Skelton, Esq., Ratwik Roszak & Maloney, PA, counsel for Defendants Tyler Burke, Amy Edberg.Gary Gutenkauf, Ginger Heurung, Derek Lavoy, Illissa Ramm, Michael Tripplet, Karri Turcotte, Jon Vukelich, Ryan Barnett, Dawn Chouinard, Shannon Wussow, Colleen Berens, Laura Johnson, Christine Madsen, Joan Smith, and Deb Nelson.

Jason M. Hill, Esq., and Robert I. Yount, Esq., Jardine, Logan, & O'Brien, P.L.L.P., Jon K. Iverson, Esq., Iverson Reuvers Condon, and Margaret A. Skelton, Esq., Ratwik Roszak & Maloney, PA, counsel for Defendants Tyler Burke, Amy Edberg, counsel for Defendant Ryan Goff.

---

## INTRODUCTION

This matter is before the Court on a Motion for Summary Judgment by Defendants Cass County, Crow Wing County, Central Minnesota Community Corrections ("CMCC") (collectively, "Entity County Defendants"), Tyler Burke, Amy Edberg, Karri Turcotte, Jon Vukelich, Derek LaVoy, Gary Gutenkauf, Ryan Barnett, Shannon Wussow, Dawn Chouinard, Michael Triplett, Ginger Heurung, Christine Madsen, Laura Johnson, Colleen Berens, Ilissa Ramm, Deb Nelson, and Joan Smith (collectively, "Individual County Defendants") (altogether, the "Moving Defendants"). (Doc. No. 337.) For the reasons set forth below, the Court grants in part and denies in part the motion.

## BACKGROUND

### I.    General Background

Plaintiff Brook Mallak's ("Plaintiff") case relates to the alleged improper access of her driver's license information, which is maintained in a database with the Department of Vehicle Services ("DVS"), a division of the Department of Public Safety ("DPS"). Plaintiff claims that the improper access of her information was in violation of the Driver's Privacy Protection Act ("DPPA") and included access to such information as her

name, date of birth, driver's license numbers, addresses, driver's license photos, weight, height, social security number, various health and disability information, and eye color.

Plaintiff received an audit report from DPS in 2013, at which time she learned that her driver's license information had been accessed by Minnesota municipal and state personnel approximately 190 times between 2003 and 2012.  (Doc. No. 350 ("Wolpert Decl.") ¶ 19, Ex. R ("Jacobson Dep.") at 135-36 & Ex. 2; Doc. No. 145 ("Mallak Aff.") ¶ 23; Doc. No. 195, Second Am. Compl. ("SAC") ¶¶ 2-5, Ex. A ("DPS Audit").)  The lookups of Plaintiff's information were run by Plaintiff's name or driver's license number rather than by her license plate number.  (Jacobson Dep. at 138-39.)  The accesses were conducted on government entity computers.  (*Id.* at 138.)

Plaintiff is a practicing attorney in Brainerd and Little Falls, Minnesota.  (Mallak Aff. ¶ 1.)  Plaintiff was a full-time public defender between 2003 and 2008 in Crow Wing and Aitkin Counties, who represented adult criminal defendants, juvenile delinquents, and parties in child welfare matters.  (*Id.* ¶ 3.)  She continues to practice criminal defense in the private sector.  (*Id.* ¶ 9.)  Plaintiff has also served on Crow Wing County Drug and DWI courts and a number of steering committees, has volunteered with numerous community organizations, and has taught as an adjunct teacher at Bemidji State University.  (*Id.* ¶¶ 5-8.)  Plaintiff is familiar with "several people within the Crow Wing County justice system" and asserts that she is known throughout her community due to her career and community involvement.  (*Id.* ¶¶ 9, 16.)

As the Court explained in a previous Order, Plaintiff has had a number of interactions with law enforcement, contrary to the representations in her original

complaint.[1]  (*See* Doc. No. 199 at 4-5.)  In particular, Plaintiff's child was reported

unresponsive to the Brainerd police on July 6, 2010.  (Mallak Aff. ¶ 14.)  The child

passed away on July 12, 2010.  (*Id.*)  The Brainerd Police Department conducted an

investigation regarding the child's death due to the nature of the circumstances

surrounding it.  (*Id.* ¶ 15.)  The autopsy was issued on approximately August 17, 2010,

indicating that the child had passed away from natural causes.  (*Id.* ¶ 18.)  Plaintiff asserts

that the tragedy of her son's death was known throughout the community.  (*Id.* ¶ 16.)

Plaintiff has also had other interactions with law enforcement relating to a reported

theft of her motor vehicle, a trespassing incident, a hit and run vehicle accident, a welfare

check, and various traffic stops.  (Doc. No. 111 ("McQuiston Aff.") ¶ 7; Mallak Aff.

¶ 31; Doc. No. 340 ("Skelton Aff.") ¶ 2, Ex. 1 ("Mallak Dep.") at 145-49, 165-67;

Skelton Aff. ¶ 2, Ex. 11.)  Excluding the investigation relating to her son's death,

Plaintiff asserts that she has never been under investigation by Defendants.  (Mallak Aff.

¶ 19.)  She also states she has never been charged with any crimes.  (*Id.* ¶ 20.)

Plaintiff was in a relationship with an individual referred to as S.M.S. from

mid-August 2009 to mid-November 2010.  (*Id.* ¶ 13.)  During this time, S.M.S. lived at

Plaintiff's home and occasionally drove Plaintiff's vehicles.  (*Id.*; Mallak Dep. at 92.)

When Plaintiff and S.M.S. ended their relationship, Plaintiff gave S.M.S. a Honda

Accord.  (Mallak Dep. at 95.)  S.M.S. has a long criminal history, has been on probation

---

[1]    Initially, Plaintiff alleged that she was not involved in an investigation or any law
enforcement-related activities that could justify the use of the DVS Database for the
access of her information.  (Doc. No. 1 ("Compl.") ¶¶ 151-53.)

through CMCC, owes a significant amount in child support, and has acted as a confidential informant for the Crow Wing County Sheriff's Office.  (*Id.* at 96-98, 115-16, 195; Skelton Aff. ¶ 2, Ex. 4 ("S.M.S. Master Name Index"); Skelton Aff. ¶ 2, Ex. 7 ("Elder Dep.") at 159-60, 205.)  Plaintiff has not seen S.M.S. since November 2010 and was not aware that S.M.S. was a confidential informant.  (Mallak Aff. ¶ 13; Mallak Dep. at 106.)  When S.M.S. lived with Plaintiff, he was not under probationary supervision. (Mallak Dep. at 106-07.)  Given their past relationship, Plaintiff and S.M.S. are associated persons in the Crow Wing County Sheriff's Office internal records to the present day.  (*See* S.M.S. Master Name Index; Skelton Aff. ¶ 2, Ex. 6 ("Mallak Master Name Index"); Elder Dep. at 207-08.)

Plaintiff claims to have suffered emotional distress in connection with her DPPA claims as well as out-of-pocket expenses such as the cost of installing an alarm system and hiring a private investigator.  (Mallak Dep. at 156-65, 205-19.)  When Plaintiff learned the identity of some of the individuals who accessed her DPS record, she was "shocked" due to her "personal and professional relationships with some of them." (Mallak Aff. ¶ 28.)  Since filing her lawsuit, Plaintiff reports that she feels targeted, fears for her safety, fears retaliation, and worries that police will be unresponsive if she calls. (Mallak Dep. at 215-16.)  She also reports having intruders come to her home since filing this lawsuit, causing her to fear for her personal safety.  (*Id.* at 159-65, 205-12; *see also* Skelton Aff. ¶ 2, Ex. 12.)  Plaintiff has not seen any medical or mental health professionals or been diagnosed with a particular condition in connection with her emotional distress.  (Mallak Dep. at 156-57.)

## II.    Procedural History

In March 2014, the Court ruled on a number of motions to dismiss in this case. The Court dismissed all DPPA claims outside of a four-year statute of limitations, all Section 1983 claims, and all invasion of privacy claims.  (*See generally* Doc. No. 89.)  As a result, a large number of claims and defendants were dismissed from the case.  (*See id.* at Order.)  However, the Court also held that Plaintiff's claim for violations of the DPPA (Count I) could proceed against multiple city and county defendants.  (*See id.*)

Plaintiff has twice amended her Complaint to replace Doe defendants with named individuals or entities.  (*See generally* Doc. No. 193 at 3-10 (summarizing the procedural history underlying these amendments).)  On June 30, 2014, Plaintiff requested discovery from the city and county defendants, and the defendants responded.  (*See* Doc. No. 150 ("Strauss Aff.") ¶¶ 3-4.)  In light of the city and county defendants' discovery responses, Plaintiff filed a First Amended Complaint on November 5, 2014, replacing individual Doe defendants with specific, named individuals.  (Doc. No. 167, First Am. Compl. ("FAC").)  On August 20, 2014, Plaintiff subpoenaed DPS, requesting production of documents identifying the individual Doe defendants who had allegedly accessed her personal information.  (Doc. No. 162 ¶ 1.)  DPS objected to the subpoena, taking the position that DPS could not disclose the requested documents absent an order from the Court.  (*Id.* ¶¶ 3-4.)  On October 3, 2014, Plaintiff and DPS filed a stipulation regarding Plaintiff's document request (*id.*), and on October 14, 2014, the Court ordered DPS to produce the documents (Doc. No. 164).  Based on the discovery obtained from DPS,

Plaintiff filed a Second Amended Complaint on March 18, 2015, replacing additional Doe defendants with named individuals and entities.  (*See generally* SAC.)

Relevant to the motion currently before the Court, Plaintiff's First Amended Complaint added the following named Defendants:  Tyler Burke, Amy Edberg, Gary Gutenkauf, Ginger Heurung, Derek LaVoy, Illissa Ramm, Michael Tripplet, Karri Turcotte, and Jon Vukelich.  (*See generally* FAC.)  Also relevant to the motion before the Court, Plaintiff's Second Amended Complaint added the following named Defendants:  Ryan Barnett, Colleen Berens, Dawn Chouinard, Laura Johnson, Christine Madsen, Deb Nelson, Joan Smith, Shannon Wussow, and CMCC.  (*See generally* SAC.)

In March 2015, the Court granted in part a Motion for Summary Judgment brought by six Defendant cities.  (*See* Doc. No. 199.)  For five accesses, the Court determined that Plaintiff's record was indisputably accessed by law enforcement officers for a permissible reason.  Thus, with respect to these accesses, there was no DPPA violation, and the cities were entitled to qualified immunity.  (*See id.* at 16-18.)  However, for five other accesses, the Court concluded that a genuine dispute of material fact remained regarding whether Plaintiff's record was accessed for a permissible purpose, and the cities were not entitled to summary judgment.  (*Id.* at 18-19.)

The motion currently before the Court relates to accesses by individuals at the following entities: Cass County,[2] Crow Wing County, and CMCC. The Court outlines evidence specific to each of the relevant accesses by entity, below.[3]

## III.  Individual Accesses

### A.  Cass County

#### i.  Derek LaVoy (February 2, 2011)

Derek LaVoy ("LaVoy") accessed Plaintiff's information from 5:38 p.m. to 5:39 p.m. on February 2, 2011.[4]  (Skelton Aff. ¶ 2, Ex. 16 ("Gutenkauf Dep.") at 121-22;

---

[2]  One of the accesses for which Plaintiff is suing Cass County is the February 2, 2011 access by Defendant Derek LaVoy. At the time of this access, Derek LaVoy was no longer employed by Cass County and instead worked at Crow Wing County. However, he logged in using Cass County credentials. (Skelton Aff. ¶ 2, Ex. 25 ("LaVoy Dep.") at 19-20, 59; Skelton Aff. ¶ 2, Ex. 7 ("Elder Dep.") at 171-73.) Plaintiff maintains that she is not suing Crow Wing County for this access but asserts her claim solely against Cass County. (*See* Doc. No. 324 at 3 n.2; *see also* Doc. No. 339 at 14 n.6.) The Court will follow the parties' convention in discussing this access as a "Cass County access." In doing so, the Court does not intend to imply that Cass County may properly be held liable for LaVoy's February 2, 2011 access.

[3]  As the Court explains, below, the amendments to Plaintiff's Complaints replacing Doe Defendants with named individuals or entities do not relate back to the filing of her original Complaint. Thus, many of the accesses at issue in this motion are time-barred. The Court will not summarize the evidence relating to time-barred claims in detail here. By this omission, the Court does not indicate a position on whether time-barred accesses may properly support Plaintiff's claim for vicarious liability against the Entity County Defendants. It is an open question whether time-barred claims against individuals may be used to support a claim for vicarious liability against entities. *See Engebretson v. Aitkin Cty.*, Civ. No. 14-1435, 2016 WL 5400363, at *7 n.4 (D. Minn. Sept. 26, 2016) (explaining that "[c]ourts are split on this issue"). Because the parties have not briefed that issue here, the Court declines to resolve it and omits discussion of these individual accesses as it is not necessary for the Court to resolve the present motion.

Wolpert Decl. ¶ 12, Ex. K at Ex. 5 ("Mallak Audit").)  From the spring of 2000 until

December 2005, LaVoy was employed by the Cass County Sheriff's Office.  (Skelton

Aff. ¶ 2, Ex. 25 ("LaVoy Dep.") at 13, 20.)  Beginning in December 2005, he was

employed by the Crow Wing County Sheriff's Office.  (*Id.* at 20.)  At Crow Wing

County, he began as a deputy before becoming an investigator in 2007.  (*Id.* at 20, 42.)

He was a member of the Drug Task Force, and he worked on the Drug Court team along

with Plaintiff.  (*Id.* at 42, 67-68; Mallak Dep. at 120-21.)

 Although he was an employee and agent of Crow Wing County on February 2,

2011, LaVoy's lookup of Plaintiff's information on this date is attributed to "Cass Co

Sheriff" because LaVoy was improperly continuing to use his Cass County credentials.

(Elder Dep. at 171-73; LaVoy Dep. at 57-59; Mallak Audit.)  LaVoy testified that he

never accessed the DVS database from a personal computer.  (LaVoy Dep. at 52-53.)

 Around the time of Plaintiff's son's death in July 2010, LaVoy stated he looked up

Plaintiff's record on his own initiative to attempt to locate S.M.S.  (*Id.* at 25-28, 33-38.)

He was not formally assigned to the investigation, and he was aware that the Brainerd

Police Department was taking the lead on the investigation.  (*Id.*)  At this time, LaVoy

---

(Footnote Continued From Previous Page)
[4] Plaintiff's DPS Audit reports this access on four separate lines.  The Eighth Circuit recently clarified, however, that "sequential accesses occurring within a several-minute time span should be considered as one obtainment rather than several."  *Tichich v. City of Bloomington*, 835 F.3d 856, 867 (8th Cir. 2016).  Thus, the Court will treat LaVoy's February 2, 2011 access as one obtainment of Plaintiff's record.  The Court will do the same when discussing other Defendants' accesses below.

knew Plaintiff, and he was familiar with S.M.S. from his work on the Drug Court team and the Drug Task Force.  (*Id.* at 35.)

According to the Moving Defendants, LaVoy accessed Plaintiff's record on February 2, 2011 in connection with a burglary investigation at the request of another deputy who was attempting to locate S.M.S.  (*Id.* at 39-40.)  LaVoy recalls that the other deputy was afraid to look up Plaintiff's record himself because Plaintiff was an attorney. (*Id.* at 39.)  LaVoy reported that the deputy who asked him to look up Plaintiff's record made the request sometime in the afternoon prior to 5:00 p.m. when LaVoy would normally finish the work day.  (*Id.* at 65-67.)  LaVoy could not explain why his February 2, 2011 lookup of Plaintiff's information is listed as 5:38 p.m. in conflict with his memory about the time of the request.  (*Id.* at 66-67.)  When asked why he would have looked up Plaintiff's historical driver's license photos on February 2, 2011, LaVoy admitted that he did so out of curiosity rather than a legitimate law enforcement purpose. (*Id.* at 90-94.)  LaVoy also looked up his own DPS record on February 2, 2011 at 5:38 p.m.  (Wolpert Decl. ¶ 2, Ex. A ("48-Hour Log") at 14.)  LaVoy never looked up S.M.S.'s record.  (Wolpert Decl. ¶ 3, Ex. B ("S.M.S. Audit").)

### ii.     Joan Smith (May 4, 2011)

Joan Smith ("Smith"), a Cass County Child Support Enforcement Aide, accessed Plaintiff's information one time at 1:16 p.m. on May 4, 2011.  (Mallak Audit; Skelton Aff. ¶ 2, Ex. 26 ("Smith Dep.") at 9-10, 16.)  Smith worked for Cass County from 2001 until her retirement in 2013.  (Smith Dep. at 8-10.)  Smith had access to the DVS database in her role as a Support Enforcement Aide.  (*Id.* at 28.)  She used the DVS

11

database to find noncustodial parents who were not paying child support and to provide addresses for service of process.  (*Id.* at 25-27.)  Smith had never heard of Plaintiff before this lawsuit, did not know Plaintiff was a defense attorney, and had never heard of Plaintiff's son's death.  (*Id.* at 43-44.)  She has no recollection of accessing Plaintiff on May 4, 2011, and she does not know why she would have accessed Plaintiff's DVS record.  (*Id.* at 46-51.)  Smith's access of Plaintiff's information took place during her normal work hours.  (*Id.* at 46.)  Cass County has no records of child support matters involving Plaintiff and is not aware of any government-related or personal reason for Smith's May 4, 2011 access.  (Doc. No. 362 ("Sullivan Aff.") ¶ 2, Ex. 1 ("Barone Dep.") at 79-80, 98-102.)  Plaintiff does not believe she knows Smith and testified that she was not familiar with her name.  (Mallak Dep. at 73.)  Smith never looked up S.M.S.'s record. (S.M.S. Audit.)

### B.    Crow Wing County

#### i.    Tyler Burke

Tyler Burke ("Burke"), a Crow Wing County dispatcher, accessed Plaintiff's information one time at 9:11 p.m. on December 14, 2010.  (Mallak Audit; Skelton Aff. ¶ 2, Ex. 13 ("Burke Dep.") at 9-11, 64-68.)  Burke was a dispatcher for Crow Wing County from 2007 to 2013 before moving to a position as a patrol deputy.  (Burke Dep. at 9-11.)  As a dispatcher, Burke frequently used the DVS database to locate information on people who called in to dispatch or to provide information to officers on patrol.  (*Id.* at 25-26, 31, 35-36.)  Burke stated that he and other dispatchers would likely use the county's internal Master Name Index rather than the DVS database to look up individuals

who had frequent contacts with the county because their internal records would contain more current information.  (*Id.* at 31-34.)  Burke explained that there was a culture within the Crow Wing County dispatch center that tolerated using the DVS database for curiosity and not only work-related use.  (*Id.* at 36-40.)  This culture changed over time, and Burke later stopped using the DVS database out of curiosity, although he could not recall specifically when his behavior changed.  (*Id.* at 48-51.)

When he looked up Plaintiff's record in December 2010, Burke was dating Amy Edberg ("Edberg"), another Defendant in this case.  (*Id.* at 71.)  They were later engaged. (*Id.* at 24, 71.)  Edberg was acquainted with Plaintiff and introduced Burke to her at some point.  (*Id.* at 60-61, 72.)  Burke asserted that he most likely met Plaintiff in person sometime after December 14, 2010.  (*Id.* at 60.)  Burke recalls hearing about Plaintiff's son's death in July 2010.  (*Id.* at 62.)  He has no recollection of accessing Plaintiff on December 14, 2010, and he does not know why he accessed Plaintiff's DVS record.  (*Id.* at 68-69.)  He is not aware of any records related to his December 14, 2010 access of Plaintiff's information.  (*Id.* at 78.)  Less than two hours after accessing Plaintiff's record, Burke accessed the record of Angel Christensen, a friend of Edberg and Plaintiff. (48-Hour Log at 6; Burke Dep. at 72; Skelton Aff. ¶ 2, Ex. 5 ("Edberg Dep.") at 82-83.) Around this time, Burke admits he was probably still using the DVS database out of curiosity.  (*Id.* at 69.)

### ii.    Amy Edberg

Edberg, a Crow Wing County dispatcher, accessed Plaintiff's information one time at 12:07 a.m. on January 30, 2011.  (Mallak Audit; Edberg Dep. at 22-23, 90-92.)

Edberg has held a position as a dispatcher at the Crow Wing County Sheriff's Office since July 2002. (Edberg Dep. at 22-23.) In 2011, she worked the night shift from 6:30 p.m. to 6:30 a.m. (*Id.* at 31, 92.) As noted above, Edberg was in a relationship with Burke starting in 2009, and the two were later engaged. (*Id.* at 15-16.) As a dispatcher, Edberg used numerous databases to look up information in connection with emergency and non-emergency calls or upon officer request. (*Id.* at 23-29, 55-63.) Specifically, Edberg recalls using the DVS database to look up individuals' full names, dates of birth, addresses, vehicle registrations, and disability certificates. (*See id.* at 60-61.) Edberg explained that she was instructed by her supervisor that she could "play around with" the DVS database to get familiar with it as long as she did not look up any famous people. (*Id.* at 41, 74.) At some point, however, she was instructed to no longer use the database in this manner. (*Id.* at 43.) After hearing of individuals being sued for improper DVS use, Edberg asserts that she changed her behavior to no longer look up records out of curiosity. (*Id.* at 78-80.)

Plaintiff and Edberg met in 2008 through a mutual friend, Angel Christensen. (*Id.* at 83.) According to Edberg, Plaintiff "was a close friend" from about 2008 to 2010. (*Id.* at 83-85.) Edberg asserts that she never personally had a dispute with Plaintiff but that the two lost contact sometime in 2010 after the relationship between Plaintiff and Angel Christensen became more complicated. (*Id.* at 85-87, 89-90.) Edberg and Plaintiff had other mutual friends including Tom Pearson, an attorney who works with Plaintiff. (*Id.* at 87-88.) Edberg recalled hearing about a dispute involving Angel Christensen, Tom Pearson, and Plaintiff. (*Id.* at 116.)

14

Edberg does not remember accessing Plaintiff's DVS record on January 30, 2011 at 12:07 a.m.  (*Id.* at 94.)  Initially, Edberg reported looking up Plaintiff on that date in connection with a traffic stop of S.M.S.  (*Id.* at 93-96.)  A Crow Wing County Sheriff's Office Incident Report documents a traffic stop involving S.M.S. on January 30, 2011 at 1:28 p.m.  (*Id.* at 98-100; *see also* Wolpert Decl. ¶ 5, Ex. D at Ex. 7 ("January 30, 2011 Incident Report").)  When asked why she would have looked up Plaintiff's information at 12:07 a.m. for a traffic stop that occurred later in the day at 1:30 p.m., Edberg stated "I don't know why I ran it that day.  If it wasn't in reference to a traffic stop, I would not know why I looked the information up."  (*Id.* at 100-01, 103-04.)  Edberg also clarified that she was originally thinking of a traffic stop involving S.M.S. that occurred in a different city than the stop documented on the January 30, 2011 Incident Report.  (*Id.* at 98, 105-07.)  Edberg did not look up S.M.S.'s DVS record on January 30, 2011. (48-Hour Log at 7-8.)  Within minutes of looking up Plaintiff's information on that day, Edberg also looked up Angel Christensen and Thomas Pearson.  (*Id.* at 7.)

### iii.    Ilissa Ramm

Ilissa Ramm ("Ramm") accessed Plaintiff's information at 8:29 a.m. on January 31, 2012 and from 9:41 a.m. to 9:44 a.m. on March 6, 2012.  (Mallak Audit.) Ramm worked as an Assistant County Attorney for the Crow Wing County Attorney's Office from 2006 to 2015.  (Skelton Aff. ¶ 2, Ex. 21 ("Ramm Dep.") at 10-11, 21.)  Her position primarily involved misdemeanor prosecutions, and she also served as the prosecutor for DWI court.  (*Id.* at 17-18.)  Ramm had access to the DVS database in this

position beginning in around 2009, and she used the database to look up information in "[a] large percentage" of the cases she worked on.  (*Id.* at 19, 21-23, 31-32.)

Plaintiff was introduced to Ramm when Plaintiff was a public defender in 2006. (*Id.* at 48-49.)  The two saw one another frequently in the courtroom and at times as opposing counsel.  (*Id.* at 48-49, 55-56.)  They also served on the DWI court together. (*Id.* at 93.)  Beginning in around 2007 or 2008, Ramm and Plaintiff also began to see one another outside of work.  (*Id.* at 49-51.)  Ramm explained that they would socialize with one another at a local bar and at the YMCA.  (*Id.* at 49-50, 56-58.)  Plaintiff also visited Ramm's house once or twice and attended Ramm's baby shower.  (*Id.* at 50-51.)

Ramm does not specifically remember accessing Plaintiff's DVS record on January 31, 2012 or March 6, 2012, but she recalls accessing her record in that general time frame in connection with a case involving S.M.S.  (*Id.* at 64-67.)  Ramm explained that she was attempting to locate S.M.S. based on an alleged Order for Protection violation reported in July 2011.  (*Id.* at 67, 71-72.)  The incident report states that S.M.S. was living in Portland, Oregon, at the time of the alleged violation.  (*Id.* at 72-75.)  Ramm asserts that she nonetheless wanted to determine if S.M.S. was back in Minnesota.  (*Id.* at 76.)  She knew that Plaintiff and S.M.S. had been associated at some point and possibly could have been at the time.  (*Id.* at 67-68.)  Ramm knew that S.M.S. and Plaintiff had broken up, but she could not recall when she knew this.  (*Id.* at 67-70, 87-88.)  She also knew that S.M.S. had driven Plaintiff's vehicle at one time.  (*Id.* at 77, 81, 84.)  Ramm testified that she looked up Plaintiff's DVS record by name to see what vehicles were registered to her.  (*Id.* at 77-79.)  The case file and Ramm's notes in the file

16

indicate that she continued to attempt to locate S.M.S. through phone records until May 2012. (*Id.* at 75-77, 80.) The file does not mention Plaintiff's name or the dates when Ramm accessed Plaintiff's DVS record. (*Id.* at 81-82, 101-02, 105-07.)

On March 6, 2012, Ramm accessed the record of Thomas Pearson, Plaintiff's law partner, in the same minute she accessed Plaintiff's record. (48-Hour Log at 15; Mallak Dep. at 37.) Ramm did not look up S.M.S.'s DPS record around these dates. (S.M.S. Audit.) Along with a "Demographics" lookup, Plaintiff's DPS Audit shows that Ramm conducted lookups on these dates designated with the following code: "/dvsinfo/VH20/VH20Select.asp." (Mallak Audit.) A VH20 lookup generates a list of the vehicles registered to the individual queried. (Jacobson Dep. at 143, 156, 266-71.)

Michael W. Quinn ("Quinn"), Plaintiff's expert, initially stated in his deposition that Ramm's explanation of her access suggested it was for a law enforcement purpose. (Wolpert Decl. ¶ 22, Ex. U ("Quinn Dep.") at 111-12.) Upon learning that Ramm did not access S.M.S.'s DVS record on the dates in question and that she accessed Plaintiff's law partner, Thomas Pearson, within seconds of accessing Plaintiff on March 6, 2012, Quinn later concluded that Ramm's explanation was not reasonable. (Wolpert Decl. ¶ 26, Ex. Y; *see also* 48-Hour Log at 14-15.)

### C.   Central Minnesota Community Corrections

#### i.   Shannon Wussow

Shannon Wussow ("Wussow") accessed Plaintiff's information from 1:37 p.m. to 1:38 p.m. on June 21, 2012 and at 4:03 p.m. on September 5, 2012. (Mallak Audit; *see also* Skelton Aff. ¶ 2, Ex. 27 ("Wussow Dep.") at 66-69, 72-73.) Since September 2008,

Wussow has been a probation agent with CMCC, an entity that provides supervisory services for Aitkin, Morrison, and Crow Wing counties.  (Wussow Dep. at 8, 15, 25, 39.) Her duties include monitoring conditions of probation through file reviews, appointments with offenders, and contacts with offenders' family members if necessary.  (*Id.* at 22-23.) Wussow had access to the DVS database beginning in 2008 until she stopped using it in September 2013.  (*Id.* at 27-29.)  Wussow was initially unaware that she was not supposed to use the DVS database for personal reasons, and she recalls using it to look up a friend's birthday and relatives' addresses.  (*Id.* at 32-33.)  She explained that there was a culture at CMCC where it was not uncommon for employees to use the DVS database for personal reasons.  (*Id.* at 33-34, 46.)  When she later found out such uses were not permitted, Wussow no longer used it for personal reasons.  (*Id.* at 32-33.)

In 2009, Wussow became familiar with Plaintiff through her work as a probation agent and through involvement in the DWI court.  (*Id.* at 54.)  Between 2009 and 2011, Plaintiff included Wussow on three e-mails sent to numerous contacts regarding a housewarming party, Plaintiff's son's hospitalization, and Plaintiff's new e-mail address. (*Id.* at 53-36, 95-97; *see also* Wolpert Decl. ¶ 24, Ex. W at Ex. 11.)  Wussow stated that she did not attend the housewarming party and that she and Plaintiff never socialized with one another.  (Wussow Dep. at 53-54, 56.)  In July 2010, Wussow recalled hearing conversations around the judicial building about Plaintiff's son's death.  (*Id.* at 90-91.) Wussow's husband was in the same circle of friends as Plaintiff in high school.  (*Id.* at 104.)

Wussow does not specifically recall accessing Plaintiff's DVS record in 2012 but believes she did so in connection with a file review involving S.M.S. (*Id.* at 57-59, 68-69, 72-74.) Wussow explained that it was common practice to review an administrative-level offender's file approximately every three months. (*Id.* at 64, 74.) When conducting a file review, Wussow explained that she "tr[ies] to gain as much information about an offender as possible." (*Id.* at 62-63, 70.) For example, she described a practice of looking up information to establish with whom the offender is residing. (*Id.* at 59.) She also explained that looking up addresses could establish whether an offender was in a relationship and noted that "[o]fentimes significant others have things to do with their significant other's probationary files." (*Id.* at 63.)

On June 21, 2012 (the date Wussow initially looked up Plaintiff's record), Wussow was assigned to monitor S.M.S.'s file in connection with a June 2012 DWI conviction. (*Id.* at 57-58, 98-99; Wolpert Decl. ¶ 24, Ex. W at Exs. 8, 12.) Wussow was aware that Plaintiff and S.M.S. had been in a significant relationship, but she was not aware if they were at the time. (*Id.* at 58-60, 85, 89.) She also did not know where Plaintiff lived. (*Id.* at 62, 85.) Wussow explained that she looked up Plaintiff's DVS record during the initial review of S.M.S.'s file on June 21, 2012 to compare Plaintiff's information to what S.M.S. had provided regarding his residence. (*Id.* at 58-60, 85-86, 89-90.) On June 21, 2012, Wussow accessed S.M.S.'s DVS record at 1:37 p.m. before looking up Plaintiff that same minute. (48-Hour Log at 29.) Between 1:37 p.m. and 1:42 p.m., Wussow looked up seven other individuals with the last name "Mallak" and Gary Handeland, Plaintiff's ex-husband. (*Id.*; *see also* Mallak Dep. at 10.)

19

On August 30, 2012, Wussow sent a letter to S.M.S. regarding his probation conditions.  (Wolpert Decl. ¶ 24, Ex. W at Ex. 10.)  She sent the letter to the Ironton, Minnesota, address he had provided in June 2012 and requested that he follow up in response by September 30, 2012.  (*Id.*; Wussow Dep. at 75.)  Around the date she sent this letter, Wussow heard from multiple sources that led her to question S.M.S.'s whereabouts.  (Wussow Dep. at 74-80, 86-87, 99, 101-02; *see also* Wolpert Decl. ¶ 24, Ex. W at Ex. 12.)  Specifically, on September 5, 2012 (the second date Wussow looked up Plaintiff), Wussow received an e-mail from the "RAP team" relating to S.M.S.'s reentry support services.  (*Id.* at 72-74.)  Wussow explained that "after being contacted by a couple different sources stating they had not been able to locate him, I would have conducted a file review and looked to see if [S.M.S.] or anybody linked to him had possibly changed addresses [to] [t]ry to narrow down possibly where he was at."  (*Id.* at 74; *see also id.* at 81, 86.)  On September 5, 2012, Wussow accessed S.M.S. at 2:03 p.m. and again at 4:02 p.m. before accessing Plaintiff at 4:03 p.m.  (48-Hour Log at 29-30.)  On this date, Wussow also looked up other individuals noted as associates in S.M.S.'s Crow Wing County Master Name Index.  (*See id.*; *see also* Wolpert Decl. ¶ 5, Ex. D at Ex. 8.)

Wussow testified that she also conducted a three-month file review for S.M.S. on September 25, 2012.  (Wussow Dep. at 80-81.)  She continued to supervise S.M.S.'s file until July 2015, but she did not look up Plaintiff's record again because she was satisfied that S.M.S. and Plaintiff were no longer residing together.  (*Id.* at 84-85.)  Plaintiff's expert, Quinn, characterized Wussow's explanation of her accesses as "reasonable" and

opined that her accesses were for a legitimate law enforcement purpose.  (Quinn Dep. at 111-12.)

Defendants Cass County, Crow Wing County, CMCC, Tyler Burke, Amy Edberg, Karri Turcotte, Jon Vukelich, Derek LaVoy, Gary Gutenkauf, Ryan Barnett, Shannon Wussow, Dawn Chouinard, Michael Triplett, Ginger Heurung, Christine Madsen, Laura Johnson, Colleen Berens, Ilissa Ramm, Deb Nelson, and Joan Smith now bring this motion for summary judgment on Plaintiff's DPPA claim.  (Doc. No. 337.)

## DISCUSSION

### I.    Legal Standard

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Courts must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party.  *Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009).  However, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v.*

*Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly

supported motion for summary judgment "may not rest upon mere allegation or denials

of his pleading, but must set forth specific facts showing that there is a genuine issue for

trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.    Standing

The Moving Defendants argue that Plaintiff lacks standing to pursue her claims

because she has not suffered a concrete injury or established a causal link between her

alleged harm and the Moving Defendants' accesses of her information.  Specifically, the

Moving Defendants point to the Supreme Court's recent decision in *Spokeo, Inc. v.

Robins*, 136 S. Ct. 1540 (2016), which clarified Article III's injury-in-fact requirement in

the context of an alleged statutory violation.

Since *Spokeo*, this Court has considered whether a plaintiff can establish standing

by alleging a statutory violation of the DPPA along with emotional distress.  *See

Krekelberg v. Anoka Cty.*, Civ. No. 13-3562 (DWF/TNL), 2016 WL 4443156, at *3 (D.

Minn. Aug. 19, 2016).  The plaintiff in *Krekelberg*, like Plaintiff here, alleged "that

Defendants violated the DPPA by accessing her private information from the motor-

vehicle records database, and that [she] experienced emotional distress as a result."  *Id.*

Following the analysis of another judge in this District outlined in *Potocnik v. Carlson*,

Civ. No. 13-2093 (PJS/HB), 2016 WL 3919950, at *3 (D. Minn. July 15, 2016), the

Court held that these allegations constituted "a concrete injury sufficient to establish

Article III standing under *Spokeo*."  *Krekelberg*, 2016 WL 4443156, at *3; *see also

Rollins v. City of Albert Lea*, Civ. No. 14-299 (SRN/HB), 2016 WL 6818940, at *13

(D. Minn. Nov. 17, 2016) (following *Potocnik*); *Engebretson v. Aitkin Cty.*, Civ.

No. 14-1435, 2016 WL 5400363, at *4 (D. Minn. Sept. 26, 2016) (same).   The Court

adopts the analysis and holding in *Krekelberg* and holds that Plaintiff has standing to

pursue her claims because she has alleged a concrete injury in the form of numerous

DPPA violations and resulting emotional distress.[5]

## III.   Relation Back of Plaintiff's Amended Complaint

The Moving Defendants also argue that many of Plaintiff's DPPA claims are

time-barred because the First and Second Amended Complaints replacing Doe defendants

with named individuals or entities do not relate back to the date of her original

Complaint.   As the Court has previously held and the Eighth Circuit has confirmed,

DPPA claims are subject to the general four-year statute of limitations provided in 28

U.S.C. § 1658(a), and the statute of limitations begins to run when the alleged violations

occur.   *See McDonough v. Anoka Cty.*, 799 F.3d 931, 939-43 (8th Cir. 2015); *Mallak v.*

*Aitkin Cty.*, 9 F. Supp. 3d 1046, 1052-55 (D. Minn. 2014).   Because Plaintiff's First

Amended Complaint was filed on November 5, 2014, her DPPA claims against the

Moving Defendants who were first named in this complaint relating to lookups conducted

---

[5]      In support of their standing argument, the Moving Defendants also assert that the
DPPA's language providing that a court may award "actual damages, but not less than
liquidated damages in the amount of $2,500," 18 U.S.C. § 2724(b)(1), requires a plaintiff
to establish actual damages.   Even if the Moving Defendants are correct that Plaintiff
must prove actual damages to recover under the DPPA—an issue which the Court does
not resolve here—what is needed to establish damages is a separate question from
whether Plaintiff has standing to assert her claims.   *See Potocnik v. Carlson*, Civ. No.
13-2093, 2016 WL 3919950, at *3 n.2 (D. Minn. July 15, 2016) ("[E]ven if [a plaintiff]
cannot prove the type of actual injury that entitles her to *damages*, the unlawful invasion
of her privacy establishes injury in fact and thus gives her *standing*.").

prior to November 5, 2010 are time-barred unless the First Amended Complaint relates back to the original Complaint. Similarly, because the Second Amended Complaint was filed on March 18, 2015, Plaintiff's DPPA claims against the Moving Defendants who were first named in this complaint relating to lookups conducted prior to March 18, 2011 are time-barred unless the Second Amended Complaint relates back to the original Complaint.

The Court has recently addressed the relation-back issue in another DPPA case involving similar claims and a similar procedural history. *See Krekelberg*, 2016 WL 4443156, at *3-6. In *Krekelberg*, the Court again followed the *Potocnik* decision and the decision of another judge in this District in *Heglund v. Aikтin Cty.*, Civ. No. 14-296 (ADM/LIB), 2016 WL 3093381, at *6 (D. Minn. June 1, 2016), concluding that relation back was not proper because designating a Doe defendant does not meet the "but for a mistake" requirement of Rule 15(c)(1)(c)(ii). *Krekelberg*, 2016 WL 4443156, at *5. Courts in this District have consistently adopted this same holding. *See Rollins*, 2016 WL 6818940, at *8 (collecting cases). The Court adopts the analysis and holding in *Krekelberg* and concludes that the First and Second Amended Complaints do not relate back to the filing of the original Complaint with respect to the Doe defendants named in each Complaint.

Additionally, the Court rejects Plaintiff's argument—raised in a footnote—that the Court should invoke equitable estoppel to prevent the statute of limitations from barring her claims. As in *Krekelberg*, Plaintiff has not alleged that Defendants engaged in the type of dishonest or unlawful conduct that would warrant the Court's invocation of this

doctrine.  *See Krekelberg*, 2016 WL 4443156, at *6; *see also Potocnik*, 2016 WL 3919950, at *5; *Engebretson*, 2016 WL 5400363, at *6.[6]

Because Plaintiff's Amended Complaints do not relate back under Rule 15(c) and equitable estoppel is not warranted, the statute of limitations bars claims against the Moving Defendants regarding lookups that occurred before November 5, 2010 (for Defendants first named in the First Amended Complaint) or March 18, 2011 (for Defendants first named in the Second Amended Complaint).  Based on Plaintiff's DPS Record and the individuals named in each amendment to the Complaint, Plaintiff's timely claims against the Moving Defendants are as follows:

| Entity | Individual | Date of Lookups |
|---|---|---|
| Crow Wing County | Tyler Burke | 12/14/2010 |
| Crow Wing County | Amy Edberg | 1/30/2011 |
| Cass County [7] | Derek LaVoy | 2/2/2011 |
| Cass County | Joan Smith | 5/4/2011 |
| Crow Wing County | Ilissa Ramm | 1/31/2012 3/6/2012 |
| CMCC | Shannon Wussow | 6/21/2012 9/5/2012 |

[6]     For the first time at oral argument, Plaintiff also appeared to argue that (1) the statute of limitations should be tolled for the period during which Plaintiff's Section 1983 and common law privacy claims remained viable based on Minnesota law governing relation back, and (2) the Defendants' delay in identifying individuals in this litigation based on the Minnesota Government Data Practices Act was improper because the DPPA preempts state privacy law.  Because these arguments were not briefed, the Court declines to consider them.

[7]     *See* footnote 2, above.

Accordingly, the Court will dismiss the following Moving Defendants from this lawsuit

based on the fact that the claims against them are barred by the statute of limitations:

Ginger Heurung, Michael Triplett, Christine Madsen, Dawn Chouinard, Ryan Barnett,

Laura Johnson, Deb Nelson, Colleen Berens, Gary Gutenkauf, Karri Turcotte, Jon

Vukelich.

## IV.    Qualified Immunity

The Moving Defendants submit that they are entitled to qualified immunity on

Plaintiff's claims.  The doctrine of qualified immunity protects state actors from civil

liability when their "conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818 (1982).  The defense provides "ample room for mistaken

judgments" as it protects "all but the plainly incompetent or those who knowingly violate

the law." *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986).  To overcome the defense of

qualified immunity, a plaintiff must show that:  "(1) the facts, viewed in the light most

favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory

right; and (2) the right was clearly established at the time of the deprivation." *Parrish v.*

*Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (citation omitted).  The Court has discretion to

decide which qualified immunity prong to consider first. *Pearson v. Callahan*, 555

U.S. 223, 236 (2009).  In determining whether the constitutional right was clearly

established at the time of the conduct, the Court must ask whether the contours of the

applicable law were "'sufficiently clear' that every 'reasonable official would have

26

understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 131 S. Ct.

2074, 2083 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  While

"[w]e do not require a case directly on point, . . . existing precedent must have placed the

statutory or constitutional question beyond debate." *Id.*

### A.      Clearly Established Right

The Moving Defendants assert that at the time of the accesses in question, it was

not clearly established that their conduct violated the DPPA.  The Court disagrees.

It is a violation of the DPPA for a defendant to:  (1) knowingly; (2) obtain,

disclose or use personal information; (3) from a motor vehicle record; (4) for a purpose

not permitted.  *McDonough*, 799 F.3d at 945 (citing 18 U.S.C. § 2724(a)); *Mallak*,

9 F. Supp. 3d at 1051-52, 1055-57.  However, there are a number of broadly applied

exceptions for which obtaining, disclosing, or using driver's license information *is*

*permitted.  See* 18 U.S.C. § 2721(b)(1)-(14) (emphasis added); *Kost v. Hunt*,

983 F. Supp. 2d 1121, 1124-25 (D. Minn. 2013).  For example, various governmental and

business purposes, such as "use by any government agency, including any court or law

enforcement agency, in carrying out its functions," are permissible.  *See* 18 U.S.C.

§ 2721(b)(1).

In this case, the Court concludes that the DPPA and its corresponding statutory

rights as applicable to this case were clearly established at the time of Plaintiff's alleged

deprivations.  That is, the "contours" of the DPPA were "sufficiently clear" at the time of

the accesses such that a reasonable official would have understood that accessing data for

a personal, and non-law enforcement purposes violated the DPPA.  *al-Kidd*, 131 S. Ct.

27

at 2083; *see, e.g.*, *Smythe v. City of Onamia*, Civ. No. 12-03149 (ADM/LIB); 2013 WL 2443849, at *5-7 (D. Minn. June 5, 2013) (outlining a number of cases where courts have found DPPA liability for a personal purpose or outright misuse and stating that accessing data out of personal interest, and not for traditional law enforcement functions, can constitute a violation of the DPPA). As the Court previously stated, "[t]he DPPA is clear that accessing driver's license information without a permissible purpose violates the law. The DPPA has been in place since 1994. By August 2009, Defendants would have been on notice of the DPPA and its prohibition of the access of driver's license information for impermissible purposes . . . if Defendants accessed Plaintiff's data *for an impermissible purpose* as alleged, it was clearly established in 2009 and thereafter, that doing so constituted a violation of the DPPA." *Mallak*, 9 F. Supp. 3d at 1063-64. This is still true today. Therefore, if the Moving Defendants accessed Plaintiff's information for an impermissible purpose, such as for personal reasons, then they are not entitled to qualified immunity.

## B. Deprivation of a Constitutional or Statutory Right

The Moving Defendants further argue that the undisputed facts either (1) establish that Plaintiff's DPS record was accessed for a permissible purpose or (2) fail to create a genuine issue for trial to establish an impermissible purpose as is required to state a claim for a violation of the DPPA. As a result, the Moving Defendants contend that Plaintiff is unable to demonstrate the deprivation of a statutory right and suggest they are entitled to qualified immunity. The Moving Defendants emphasize Plaintiff's numerous contacts with local law enforcement and criminal justice agencies and her well-known relationship

with S.M.S., an individual with a lengthy criminal record.  They also urge the Court to apply the presumption of regularity which holds that "'in the absence of clear evidence to the contrary,' courts presume that public officers 'have properly discharged their official duties.'"  *McDonough*, 799 F.3d at 948 (quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996)).  The Moving Defendants argue that Plaintiff has failed to provide clear evidence to override this presumption and establish an impermissible purpose.

Plaintiff, on the other hand, asserts that the Moving Defendants' failure to recall specific reasons for their accesses and the surrounding circumstantial evidence indicates (1) an improper purpose, (2) the absence of a permissible purpose, or (3) a dispute of fact as to the purpose.  She also asserts that specific facts in the record raise a genuine dispute over the veracity of the explanations offered by the Moving Defendants.[8]

---

[8]     In conjunction with her brief in opposition to the Moving Defendants' Motion for Summary Judgment, Plaintiff submitted a Declaration in which Plaintiff remarks on various accesses by the Individual County Defendants made within forty-eight hours of accessing Plaintiff's record as identified on the 48-Hour Log.  The Moving Defendants ask the Court to strike this Declaration under Rule 56(c)(2) and (4) because it fails to contain facts that would be admissible at trial.  The Moving Defendants raise two evidentiary challenges.  First, they assert that Plaintiff's arguments based on the Declaration and the 48-Hour Log constitute improper character or other act evidence under Federal Rule of Evidence 404.  Second, the Moving Defendants suggest that the Declaration raises foundational concerns because it is not clear that the statements contained therein are based upon Plaintiff's personal knowledge.  The Moving Defendants therefore object to the admission of Plaintiff's Declaration pursuant to Rule 56(c)(2).  The Court overrules the Moving Defendants' objection.

Federal Rule of Evidence 404(b), governing the admission of other act evidence, does not apply to evidence that is intrinsic to the alleged misconduct.  *See United States v. Johnson*, 463 F.3d 803, 808 (8th Cir. 2006).  As the Eighth Circuit has explained in the criminal context, "[e]vidence of other wrongful conduct is considered intrinsic when it is offered for the purpose of providing the context in which the charged crime occurred. Such evidence is admitted because the other crime evidence completes the story or

(Footnote Continued on Next Page)

With respect to the following accesses, the Court concludes that the facts, viewed in the light most favorable to the plaintiff, fail to create a genuine dispute over whether these Individual County Defendants violated Plaintiff's statutory rights under the DPPA:

| Entity | Individual | Date of Lookups |
|---|---|---|
| Cass County | Joan Smith | 5/4/2011 |
| CMCC | Shannon Wussow | 6/21/2012<br>9/5/2012 |

(Footnote Continued From Previous Page)

provides a total picture of the charged crime." *Id.* (internal quotation marks and citations omitted). In this case, to the extent Plaintiff relies on the 48-Hour Log and the statements in her Declaration to identify suspicious and related lookups at the same time or near the lookups of her information, such evidence would be intrinsic to the alleged misconduct and beyond the scope of Rule 404(b).

In addition, to the extent other acts are deemed extrinsic to the conduct in question, such evidence may nonetheless be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2); *see also Johnson*, 463 F.3d at 808. Whether the Individual County Defendants used the DVS database for impermissible purposes on other occasions would be admissible under this exception to establish that they had the opportunity to use the DVS database for personal reasons given a lack of oversight by their employers. If proven at trial, such evidence would be relevant to support Plaintiff's claims that the Individual County Defendants impermissibly accessed her record on the dates in question and would not unduly prejudice the Individual County Defendants.

To the extent the Moving Defendants question Plaintiff's personal knowledge of facts contained in the Declaration, they will have an opportunity to cross-examine Plaintiff at trial. While the Court acknowledges that the Declaration contains some statements that appear to be based on speculation, the Court declines to strike the Declaration in its entirety merely because some portions may be deemed beyond the scope of Plaintiff's personal knowledge on cross-examination.

In sum, Plaintiff's responsive Declaration will be deemed part of the record and the Moving Defendants' objection is overruled. The Court notes, however, that much of the relevant information contained in this Declaration is duplicative of other evidence in the record. With or without this Declaration, therefore, the Court's conclusions regarding the Moving Defendants' Motion for Summary Judgment would be the same.

The Moving Defendants have sufficiently established that there is no genuine issue of material fact regarding the reasons for these accesses.  No reasonable jury could find that the accesses were made for an impermissible purpose because the facts either (1) fail to raise a genuine dispute over the permissibility of the access in question or (2) demonstrate that the access was indisputably made for the purpose of carrying out government functions.  *See* 18 U.S.C. § 2721(b) (including language that "use by any government agency, including any court or law enforcement agency, in carrying out its functions" is permissible).  In either case, the Moving Defendants are entitled to summary judgment based on qualified immunity.

Considering Smith's access, Plaintiff fails to demonstrate the existence of any *specific facts* in the record that could create a genuine issue for trial.  *See Krenik*, 47 F.3d at 957.  Although Smith does not recall her purpose for accessing Plaintiff's record and Cass County was not aware of any government-related purposes for the access, the access was in the middle of the afternoon during her normal work hours.  Smith testified that she used the DVS database in the course of her employment to locate noncustodial parents in child support matters.  To support an inference that Smith's lookup was impermissible, Plaintiff only notes that Smith never accessed S.M.S.'s record.  In light of Smith's testimony that she did not know Plaintiff and had never heard of her son's death, a jury would be forced to speculate that her access was impermissible.  *Cf. McDonough*, 799 F.3d at 949-50 (finding no viable DPPA claim where the inference of an impermissible purpose would be based on "sheer conjecture rooted solely in the blanket allegations of misconduct, [the plaintiff's] professional interactions with law

enforcement personnel in general, and the high volume of collective accesses"). Thus, Plaintiff has failed to establish a genuine issue of material fact as to this Defendant.

With respect to Wussow's accesses, the Moving Defendants point to specific evidence which shows that she was carrying out a legitimate governmental function when she accessed Plaintiff's information. On the first access date, Wussow testified that she was likely conducting an initial file review of S.M.S. whom she was assigned to supervise in her capacity as a probation agent at CMCC. Documentary evidence supports this explanation. On the second date, Wussow testified that she believed she looked up Plaintiff's record because she was attempting to confirm S.M.S.'s whereabouts in connection with her probationary supervision duties. Evidence in the record corroborates Wussow's explanations because she looked up S.M.S. and Plaintiff within the same time period on both of these dates. Plaintiff's expert suggested that Wussow offered a legitimate reason for accessing Plaintiff's record. Although Plaintiff and Wussow were familiar with one another through work on the DWI Court, the record suggests that they were nothing more than professional acquaintances. Further, the fact that Wussow looked up Mallak's ex-husband and family members around the time she looked up Plaintiff is consistent with her legitimate proffered reason for accessing Plaintiff's record—to conduct a thorough file review of S.M.S., including looking at individuals with whom he is associated. The Court acknowledges that the permissibility of Wussow's access is a close question. However, the Court ultimately concludes that the facts in the record fail to raise a genuine dispute regarding Wussow's legitimate reasons for accessing Plaintiff's record.

Defendants are entitled to qualified immunity for these two accesses because there is no deprivation of a statutory right and, as a result, Plaintiff's claims are dismissed as to these accesses. The Court will therefore dismiss Defendants Smith and Wussow from this lawsuit.

However, with respect to the following accesses, the Court agrees with Plaintiff that a genuine dispute of material fact exists regarding whether her record was accessed for a purpose not permitted:

| Entity | Individual | Date of Lookups |
|---|---|---|
| Crow Wing County | Tyler Burke | 12/14/2010 |
| Crow Wing County | Amy Edberg | 1/30/2011 |
| Cass County [9] | Derek LaVoy | 2/2/2011 |
| Crow Wing County | Ilissa Ramm | 1/31/2012 3/6/2012 |

In these instances, the Moving Defendants have failed to show that the undisputed facts preclude a finding that Plaintiff's records were accessed for an impermissible purpose.

For Defendants Burke and Edberg, their failure to recall a specific purpose for their accesses combined with Plaintiff's familiarity with them provides sufficient circumstantial evidence by which a jury could determine that their accesses were for a purpose not permitted by the DPPA. Edberg had been friends with Plaintiff prior to her January 30, 2011 lookup, and Burke was dating Edberg when he looked up Plaintiff's information on December 14, 2010. Notably, both Defendants looked up other

---

[9]      *See* footnote 2, above.

acquaintances or mutual friends of Plaintiff around the time they looked up Plaintiff on these dates. Absent a legitimate explanation for these look-ups, jurors could reasonably infer that Burke and Edberg looked up Plaintiff for personal reasons.

Defendants LaVoy and Ramm both propose explanations for their lookups of Plaintiff's information, but Plaintiff has identified evidence which raises a genuine dispute regarding these explanations. *See Taylor v. City of Amboy*, Civ. No. 14-0722 (PJS/TNL), 2016 WL 5417190, at *4 (D. Minn. Sept. 27, 2016) (denying summary judgment on qualified immunity where "a jury could find that [defendants'] proffered reasons are *false*").

LaVoy knew Plaintiff through their work together on the Drug Court team. LaVoy claims that he looked up Plaintiff's record in connection with a burglary investigation of S.M.S., but he provides no documentation to support this explanation, and his recollection of the timing of this lookup conflicts with the timing noted on Plaintiff's DPS Audit. In addition, LaVoy admitted that he had no legitimate law enforcement reason to look at Plaintiff's historical photos and that he did so out of curiosity. Finally, LaVoy also admitted that he looked up Plaintiff's information around the time her son passed away on his own initiative and without legitimate authorization to do so. This prior unusual access further supports the inference that LaVoy's February 2011 lookup was improper. *Cf. McDonough*, 799 F.3d at 946 (holding that time-barred accesses may be considered to support the plausibility of timely claims).

Ramm appeared as opposing counsel against Plaintiff on multiple occasions and socialized with her outside of work. Although there is some evidence to support Ramm's

explanation that she looked up Plaintiff's motor vehicle record in an attempt to locate

S.M.S., there is also evidence in the record that disputes this explanation.  Ramm did not

look up S.M.S. around the time of these lookups, and she inexplicably looked up

Plaintiff's law partner just after accessing Plaintiff.  In light of these facts, Plaintiff's

expert opined that Ramm's lookup was not conducted for a legitimate purpose.  The

permissibility of Ramm's access is indeed a close question.  However, given the

relationship between Ramm and Plaintiff and viewing the evidence in the light most

favorable to Plaintiff, the Court concludes that a genuine issue of material fact remains

regarding whether Ramm accessed Plaintiff's record impermissibly.  *See Mallak v. City

of Baxter*, 823 F.3d 441, 446-47 (8th Cir. 2016) (noting the relevance of relationships

with particular individuals to support a DPPA claim).

 For Defendants Burke, Edberg, LaVoy, and Ramm, any presumption of regularity

on the part of these government officials has been adequately rebutted by the record in

this case.  *See McDonough*, 799 F.3d at 948 (finding the presumption of regularity

"sufficiently rebutted" at the motion to dismiss stage based on the plaintiffs' allegations

including high volumes and suspicious timing of access and "the legislative auditor's

report finding that at least half of Minnesota law enforcement officers were misusing

personal information in the database").  Plaintiff has identified sufficient evidence by

which a jury could conclude that these Defendants accessed her DPS record for an

impermissible purpose.

 In sum, on the record before the Court, Plaintiff could overcome qualified

immunity by establishing that these Defendants' violated her clearly established rights

under the DPPA.  Thus, summary judgment is not appropriate on this basis for these

Defendants.

## V.      Entity County Defendants' Liability

### A.      Direct Liability

The Moving Defendants argue that Crow Wing County, Cass County, and CMCC

cannot be held directly liable for violating the DPPA because there is no evidence to

suggest that these entities themselves knowingly obtained, disclosed, or used Plaintiff's

DPS record.  The Court agrees.

The DPPA creates liability against "a person who knowingly obtains, discloses or

uses personal information, from a motor vehicle record, for a purpose not permitted."

18 U.S.C. § 2724(a).  The DPPA's definition of "person" includes "an individual,

organization or entity, but does not include a State or agency thereof."  18 U.S.C.

§ 2725(2).  The Entity County Defendants are thus "persons" under the DPPA.  However,

as discussed above, to establish a DPPA violation, a plaintiff must prove that the person:

(1) knowingly; (2) obtained, disclosed or used personal information; (3) from a motor

vehicle record; (4) for a purpose not permitted.  *McDonough*, 799 F.3d at 945 (citing

18 U.S.C. § 2724(a)); *Mallak*, 9 F. Supp. 3d at 1051-52, 1055-57.  As the Court explained

in a previous order dismissing all claims against DPS Commissioners Ramona Dohman

and Michael Campion, "[p]ursuant to the plain language of the statute, any obtainment,

disclosure or use *must* be for a purpose not permitted."  *Mallak*, 9 F. Supp. 3d at 1065-67.

Similarly, the plain language of the statute requires that such obtainment, disclosure, or

use be done knowingly.

36

Plaintiff fails to present facts to establish that the Entity County Defendants knowingly obtained, disclosed, or used her DPS record for an impermissible purpose. *See Rollins*, 2016 WL 6818940, at *11-12 (finding city defendants not directly liable because "[t]here is no evidence that the Cities knowingly provided the Officers with access to the DVS and BCA Databases for an impermissible purpose"); *Engebretson*, 2016 WL 5400363, at *7 ("There is no evidence that the Cities provided their law enforcement officers with access to the database for any reason other than the permissible purpose of carrying out their law enforcement duties."); *Potocnik*, 2016 WL 3919950, at *6 (noting that the city defendant did not disclose the information because it was actually disclosed by DPS, but explaining that "even if the City had disclosed the information to the officers, [plaintiff] makes no effort to show that the City did so for a purpose not permitted under the DPPA").  The Court agrees with the reasoning in *Rollins*, *Engebretson*, and *Potocnik* on this issue, and adopts it here.  Additionally, and as noted by other courts in this District, Plaintiff's argument that the Entity County Defendants improperly accessed Plaintiff's information through their agents and should thus be held liable is a claim for vicarious, not direct, liability.  *See, e.g.*, *Rollins*, 2016 WL 6818940, at *12.  Thus, the Court turns to the question of the Entity County Defendants' vicarious liability for the Individual County Defendants' accesses of Plaintiff's DPS record.

### B.      Vicarious Liability

The Moving Defendants ask the Court to hold that vicarious liability is not a

viable theory of relief under the DPPA.  They urge the Court to adopt the analysis of

another judge in this district in *Weitgenant v. Patten*, Civ. No. 14-255 (ADM/FLN),

2016 WL 1449572, *5-7 (D. Minn. Apr. 12, 2016), who concluded that imposing

vicarious liability for government entities would be contrary to the legislative history

underlying the DPPA.  The Moving Defendants further argue that even if vicarious

liability were available, Plaintiff would be unable to establish liability in this case

because the Individual County Defendants were acting outside the scope of employment

when they improperly accessed her DPS record.

Plaintiff, on the other hand, asks the Court to follow multiple cases outside of this

district which have held that the DPPA imposes vicarious liability against entities for

their employees' improper accesses.  *See Schierts v. City of Brookfield*, 868 F. Supp. 2d

818 (E.D. Wis. 2012); *Menghi v. Hart*, 745 F. Supp. 2d 89 (E.D.N.Y. 2010); *Margan v.

Niles*, 250 F. Supp. 2d 63 (N.D.N.Y. 2003).  Consistent with these cases, Plaintiff urges

the Court to apply federal common law principles which hold principals liable for the

actions of their agents when the agents act with apparent authority or are aided in

committing the tort by the existence of the agency relationship.  Under these principles,

Plaintiff argues, the Entity County Defendants should be held vicariously liable because

the Individual County Defendants conducted their accesses during work hours, on work

computers, and using a password-protected database made available to them for the

purpose of performing official duties.  Plaintiff also notes that imposing vicarious

liability in this situation will have a deterrent effect by encouraging entities to implement safeguards to prevent future violations.  Such deterrence, Plaintiff argues, is consistent with Congress's overriding goals in passing the DPPA.

### i.      Vicarious Liability as a Theory of Relief

The DPPA is silent on whether entities can be vicariously liable for their employees' conduct.  When Congress is silent on vicariously liability, Courts should assume that it legislated against an ordinary understanding of general common law principles.  *See Meyer v. Holley*, 537 U.S. 280, 285 (2003) ("[W]hen Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules."); *see also Engebretson*, 2016 WL 5400363, at *8.  With respect to the theory of vicarious liability advanced by Plaintiff here, common law agency principles espoused in the Restatement (Second) of Agency are instructive.  Indeed, the Supreme Court has explicitly turned to the Restatement as a "starting point" for analysis in evaluating vicarious liability claims under federal law.  *See Faragher  v. City of Boca Raton*, 524 U.S. 775, 802 & n.3 (1998).

Importantly, the Restatement posits more than one theory of vicarious liability— scope of employment does not end the inquiry.  In particular, the Restatement provides:

(1) A master is subject to liability for the torts of his servants committed while acting in the scope of their employment.
(2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
    (a) the master intended the conduct or the consequences, or
    (b) the master was negligent or reckless, or
    (c) the conduct violated a non-delegable duty of the master, or

> (d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.

Restatement (Second) of Agency § 219.  As the Supreme Court articulated in *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 758 (1998), scope of employment is thus a completely separate theory of liability from the circumstances identified in Restatement § 219(2) under which principals may be held liable for the conduct of their agents.  *See id.* ("Scope of employment does not define the only basis for employment liability under agency principles."); *Primeaux v. United States*, 181 F.3d 876, 879 (8th Cir. 1999) ("§ 219(2)(d) places apparent authority liability outside the realm of scope of employment liability—it is 'an entirely separate category of agency law.'" (quoting *Faragher*, 524 U.S. at 801)); *Taylor*, 2016 WL 5417190, at *2 (discussing the separate theories of apparent authority and scope of employment liability).  *Margan v. Niles*, the leading case cited by Plaintiff, focuses on apparent authority as the operative theory to impose vicarious liability under the DPPA.  *See Margan*, 250 F. Supp. 2d at 72-75.  In *Margan*, the court explained:

> Because there is nothing in the DPPA suggesting that it was not intended to impose vicarious liability and "application of the apparent authority doctrine advances the [DPPA's] goals and produces no inconsistencies with other [DPPA] provisions, . . . a theory of [vicarious] liability is an appropriately operative theory of liability under the statute."

*Id.* at 75 (quoting *Jones v. Federated Fin. Reserve Corp.*, 144 F.3d 961, 966 (6th Cir. 1998)).  Similar reasoning has been applied by numerous courts, including multiple Judges in this District.  *See Menghi*, 745 F. Supp. 2d at 99; *Schierts*, 868 F. Supp. 2d at

821-22; *Rollins*, 2016 WL 6818940, at *12-13; *Engebretson*, 2016 WL 5400363, at *7-9;

*Potocnik*, 2016 WL 3919950, at *6-7.

This Court agrees with these cases to the extent that they hold that entities may be held vicariously liable under the DPPA even if the employee's improper accesses fell outside the scope of employment. However, the Court writes to clarify a point of distinction that has been somewhat muddled by the parties' briefing and these courts' opinions. In addition to apparent authority being a completely separate theory of relief from scope of employment, Restatement § 219(2)(d) identifies two separate bases for establishing vicarious liability. As the Supreme Court discussed in *Burlington*, 524 U.S. at 759-60, vicarious liability under this provision may be imposed based on the "apparent authority rule" or the "aided in the agency relation" rule. *See also Faragher*, 524 U.S. at 801-02 (discussing § 219(2)(d) and clarifying that the "aided-by-agency-relation principle" provides a separate avenue for relief from apparent authority). The apparent authority rule applies to situations where a principal makes manifestations to a third party who is led to believe that the agent is acting with authority delegated by the principal. *See Am. Soc'y of Mech. Eng'rs*, 456 U.S. 556, 565-66 & n.5 (1982). The aided-in-the-agency-relation rule does not involve the same manifestations to third parties and merely results from the fact that the agent was "aided in accomplishing the tort by the existence of the agency relation." Restatement (Second) of Agency § 219(2)(d). Discussing these rules in the context of a sexual harassment case, the Supreme Court explained, "When a party seeks to impose vicarious liability based on an agent's misuse of delegated authority, the Restatement's aided in the agency relation rule, rather than the

41

apparent authority rule, appears to be the appropriate form of analysis." *Burlington*, 524

U.S. at 759-60. Plaintiff appears to invoke both of these rules, and the Court writes to

clarify its understanding of how these rules could apply to impose liability under the

DPPA.[10]

Depending on the circumstances, the DPPA may be construed to impose liability

under either an apparent authority or aided-in-the-agency-relation theory. For example,

apparent authority may be the proper theory of relief if an officer requests a DVS record

and a third-party at DPS provides the record based on the officer's apparent authority and

the belief that he is requesting the information for a permissible purpose. In this

circumstance, "the relevant inquiry for the fact-finder would [be] whether [the entity]

manifested to third persons [the officer's] apparent authority to act for it and whether

there was reliance on this apparent authority." *Jones*, 144 F.3d at 967 (applying apparent

authority principles to evaluate the scope of vicarious liability under the Fair Credit

Reporting Act). On the other hand, such manifestations and third-party reliance may not

be necessary if the officer's misconduct is simply furthered by the agency relationship.

As other courts have suggested, DPPA liability may properly lie on this basis where an

officer uses government entity computers and accesses the DVS database using a

password made available as a result of the officer's position. *See Engebreston*, 2016 WL

---

[10]     In briefing this issue, the parties reference scope-of-employment, apparent
authority, and aided-in-the-agency-relation principles without clearly delineating the
applicable theory of relief. While perhaps a needless distinction for purposes of resolving
this motion, the Court writes to clarify its understanding of these principles to aid the
parties in presenting their arguments relating to the Entity County Defendants' vicarious
liability in the future.

5400363, at *9 ("[T]he Individual Defendants' positions as law enforcement officers for the City Defendants facilitated the alleged wrongdoing because they had access to the DVS Database as a result of their positions.").

The parties have not briefed—and it is not altogether clear—whether any third parties acted in reliance upon the acts or representations of the Entity County Defendants in permitting the Individual County Defendants to access the DVS database under their authorized passwords.  If the computer system operated automatically to provide the Individual County Defendants with Plaintiffs' DPS record without the intervention of any third parties, strictly speaking "apparent authority" may not be applicable to hold the entities liable in this case.  On the other hand, if the Entity County Defendants made affirmative representations to DPS regarding the permissibility of their agents' accesses, apparent authority may properly support vicarious liability.  However, the Court need not definitively resolve this issue.  Rather, because a fact-finder could conclude that the Individual County Defendants were "aided in accomplishing the tort by the existence of the agency relation," Restatement (Second) of Agency § 219(2)(d), the Court concludes that the Entity County Defendants are not entitled to summary judgment on vicarious liability.  The evidence suggests that the Individual County Defendants accessed Plaintiff's DPS record via county workstations using passwords provided for their use as agents of the Entity County Defendants.  Accordingly, the Court holds that the Entity

County Defendants may be vicariously liable under the DPPA based on the aided-in-the-agency relation rule.[11]

Finally, as numerous courts have emphasized, imposing vicarious liability in this context has an important deterrent effect. *See, e.g.*, *Margan*, 250 F. Supp. 2d at 74-75. Counties held liable for the misuse of their agents will have strong incentives to develop enhanced safeguards such as routine monitoring and training to ensure that private records are only accessed for permissible purposes. Thus, the Court concludes that vicarious liability for the Entity County Defendants is both consistent with the DPPA's purpose and factually tenable in this case.

### ii.    Entity County Defendants' Vicarious Liability for Remaining Claims

As discussed above, vicarious liability against government entities is a viable theory of relief under the DPPA and applicable in this case because the Individual County Defendants were aided in their impermissible lookups by the existence of their position as agents of the Entity County Defendants. The Court must now determine the effect of this holding on the Moving Entity County Defendants—Crow Wing County, Cass County, and CMCC—in light of the fact that numerous Individual County Defendants will be dismissed from this case on statute-of-limitations or qualified immunity grounds.

Crow Wing County employed all four remaining Individual County Defendants—LaVoy, Burke, Edberg, and Ramm—when they accessed Plaintiff's DVS record, and the

---

[11]    The Court does not rule at this time on the applicability of "apparent authority" as a viable theory upon which to impose vicarious liability in this case.

record indicates that these individuals were acting as Crow Wing County's agents.

Therefore, Plaintiff has a viable claim against Crow Wing County for vicarious liability

with respect to these Individual County Defendants' timely accesses.  Crow Wing County

also employed numerous Individual County Defendants against whom Plaintiff has

asserted untimely claims.  Because Crow Wing County was named in Plaintiff's original

Complaint along with numerous John and Jane Doe employees, the lookups conducted by

these Individual County Defendants might further support claims against Crow Wing

County based on vicarious liability.  Whether such time-barred claims may be used to

impose vicarious liability is an open question and one that has not been briefed by the

parties here.  *See Engebretson*, 2016 WL 5400363, at *7 n.4 (explaining that "[c]ourts are

split on this issue"); *see also Potocnik*, 2016 WL 3919950, at *8 (describing this as "an

important and complicated issue on which different jurisdictions have adopted different

rules").  Absent briefing from the parties on this issue, the Court declines to award

summary judgment in Crow Wing County's favor with regard to its vicarious liability for

the time-barred claims against now-identified John and Jane Does.[12]  *See Rollins*, 2016

WL 6818940, at *9.  Notwithstanding the proper resolution of this issue, Crow Wing

---

[12]     Specifically, these Individual Defendants include Ginger Heurung, Michael
Triplett, Christine Madsen, Laura Johnson, Deb Nelson, Colleen Berens, Gary
Gutenkauf, Karri Turcotte, and Jon Vukelich.

County shall remain in the case given the remaining timely claims against LaVoy,[13] Burke, Edberg, and Ramm.

Turning to Cass County, Plaintiff identifies LaVoy and Smith as the relevant Individual County Defendants associated with this entity.  Plaintiff asserts that Cass County should be held vicariously liable for LaVoy's February 2, 2011 access because Cass County failed to terminate LaVoy's Cass County credentials which he used to conduct this access.  As the Court explained above, vicarious liability under the DPPA is proper in this case because the Individual County Defendants were aided in committing DPPA violations by the existence of their agency relationship with the Entity County Defendants.  However, in February 2011, no agency relationship existed between Cass County and LaVoy.  It is undisputed that LaVoy was employed by Crow Wing County and acting as its agent when he accessed Plaintiff's information in February 2011.[14] Contrary to Plaintiff's position, there is no basis upon which to impose vicarious liability

---

[13]     By presenting LaVoy's access as attributable to Cass County, Plaintiff has appeared to suggest that Crow Wing County should not be held vicariously liable for this access.  Absent specific briefing from the parties on this issue, however, the Court declines to conclude that Crow Wing County is entitled to summary judgment on the vicarious liability issue with respect to LaVoy.

[14]     The Court acknowledges that Cass County's failure to ensure that LaVoy's DVS database credentials were terminated and LaVoy's continued use of these credentials while he was employed by Crow Wing County may have been improper.  However, this fact is not enough to establish that Cass County should be held vicariously liable for LaVoy's conduct under the DPPA.  It is the presence of an agency relationship that supports such liability, and there simply was no such relationship between LaVoy and Cass County in February 2011.

under the DPPA against Cass County based on LaVoy's access.[15]  Thus, Plaintiff's only

claim which could be construed to support vicarious liability against Cass County is the

claim against Smith.  Because the Court concludes that Smith is entitled to qualified

immunity for her May 4, 2011 access, Plaintiff has no viable claim by which to impose

vicarious liability against Cass County.  The Court will therefore dismiss Cass County

from this lawsuit.

With respect to CMCC, the relevant Individual County Defendants include Dawn

Chouinard, Ryan Barnett, and Wussow.  Unlike Crow Wing County, CMCC was not

named as an Entity County Defendant until Plaintiff filed her Second Amended

Complaint on March 18, 2015.  Because Plaintiff's Second Amended Complaint does not

relate back with respect to Doe defendants named in the original Complaint, Plaintiff's

DPPA claim against CMCC relating to all lookups conducted prior to March 18, 2011 are

time-barred by the statute of limitations.  This applies to the lookups conducted by Dawn

Chouinard and Ryan Barnett which took place in 2009 and 2010.  Furthermore, because

the Court has concluded that Wussow is entitled to qualified immunity for her accesses

on June 21, 2012 and September 5, 2012, Plaintiff no longer has a viable claim to support

---

[15]     The Court previously affirmed Magistrate Judge Brisbois's June 30, 2016 Order
on Plaintiff's Motion to Compel deposition testimony by Cass County relating to LaVoy.
(*See* Doc. No. 363.)  In that Order, Magistrate Judge Brisbois appeared to apply
scope-of-employment principles in determining that Cass County could not be held
vicariously liable for LaVoy's access.  (*See* Doc. No. 354 at 17.)  Although the Court
now concludes that scope of employment is not the only theory under which vicarious
liability may be available under the DPPA, the Court would still conclude that discovery
sought from Cass County with respect to LaVoy's access would be irrelevant.  Thus, the
Court continues to conclude that affirming Magistrate Judge Brisbois' June 30, 2016
Order on this issue was proper.

vicarious liability against CMCC.  The Court will therefore dismiss CMCC as a party

from this lawsuit.

## VI.    Punitive Damages

On the availability of punitive damages, the Moving Defendants argue that

summary judgment must be entered in their favor because there is no evidence in the

record that any of the Individual County Defendants knew of the DPPA's existence or

violated it with the necessary level of intent.  Citing the Third Circuit's decision in

*Pichler v. UNITE*, 542 F.3d 380, 397 (3d. Cir. 2008), the Moving Defendants argue that

the DPPA requires proof that a "party appreciated it was engaging in wrongful conduct"

under the DPPA in order to impose punitive damages.

Plaintiff argues that the Moving Defendants have misinterpreted *Pichler* to elevate

the standard necessary to impose punitive damages under the DPPA.  She argues that she

is entitled to a jury verdict on this issue based on the evidence in the record.  Specifically,

Plaintiff points to a Crow Wing County Sheriff's Office Policy Manual citing the DPPA

as well as the Individual County Defendants' deposition testimony establishing that they

knew they were not supposed to use the DVS database for personal reasons.

The DPPA provides that a court may award "punitive damages upon proof of

willful or reckless disregard of the law."  18 U.S.C. § 2724(b)(2).  When there is

sufficient evidence to permit a finding of a willful or reckless violation of the DPPA, the

punitive damages question is properly submitted to a jury.  *See Rollins*, 2016 WL

6818940, at *19.  However, if the record lacks evidence that a defendant was aware that

his or her conduct might violate the law, a court may determine that the defendant is

entitled to summary judgment.  *See English v. Parker*, No. 6:09-CV-1914-ORL-31, 2011

WL 1842890, at *5 (M.D. Fla. May 16, 2011) ("The record is devoid of any evidence

that [the defendant] knew of the existence of the DPPA, much less willfully or recklessly

disregarded it.").  *Cf. Sturgill v. United Parcel Serv., Inc.*, 512 F.3d 1024, 1035 (8th Cir.

2008) (explaining, in the context of a Title VII employment discrimination claim, that

"punitive damages are inappropriate if the employer was unaware of the federal

prohibition").[16]  Because Plaintiff has failed to come forward with specific evidence from

which a jury could reasonably infer that the remaining Individual County Defendants—

LaVoy, Burke, Edberg, and Ramm—willfully or recklessly disregarded the law, the

Court concludes that Plaintiff is not entitled to submit the issue of punitive damages to a

jury.

First, Plaintiff points to a Crow Wing County Policy Manual that references the

DPPA and asserts that this manual was received by all Crow Wing County Individual

---

[16]     Nothing within the statute provides that an individual must have known the
specific name of the law he or she was willfully or recklessly disregarding to support a
punitive damages award.  An individual may have an understanding that something is
prohibited by law without knowing the name of the particular governing law.  Individuals
who violate the law in this situation would be equally culpable as those who know the
particular name of the federal law governing their actions.  *See, e.g.*, *E.E.O.C. v.
Siouxland Oral Maxillofacial Surgery Assocs., L.L.P*, 578 F.3d 921, 925–26 (8th Cir.
2009) (holding that the "evidence was sufficient for a jury to infer that [the defendant]
acted knowing that his conduct may be violating federal law," and referencing, among
other things, the fact that the defendant "knew that pregnancy discrimination was
illegal").  Therefore, the Court rejects the Moving Defendants' position to the extent they
suggest that Plaintiff must establish that the Individual County Defendants specifically
knew that there was a law known as the Driver's Privacy Protection Act codified at
18 U.S.C. §§ 2721-2725.  However, the statute's text does support the requirement that a
defendant at least know that his actions are *unlawful*—not merely against employer
policies or rules.

Defendants.  However, this manual was plainly adopted in March 2014, and Plaintiff has offered no evidence to suggest that a manual including this same language existed at the time of the Individual County Defendants' accesses in question.  Second, Plaintiff asserts that the Individual County Defendants' testimony establishes that they knew the database was to be used for law enforcement purposes and not for personal reasons or curiosity. This is insufficient to support a finding of a willful or reckless violation of the DPPA. Even if the Individual County Defendants were aware that personal accesses violated county policies or even basic common sense, this is not tantamount to awareness that such accesses were against the law.

The remaining Individual County Defendants accessed Plaintiff's record between December 2010 and March 2012.  Although DPS now requires individual users accessing the DVS database to sign contracts that clearly lay out the laws governing misuse, including the DPPA, no evidence has been identified to establish that the remaining Individual County Defendants had ever seen or signed such agreements at the time of their questionable accesses.  (*See* Wolpert Decl. ¶ 7, Ex. F at Ex. 11 (DVS Business Partner Individual Web Application Agreement and Intended Use Statement, dated February 2013); Skelton Aff. ¶ 2, Ex. 9 ("Ryan Dep.") at 107-09.)  Such agreements were in use by DPS as early as 2007 or 2008, and Crow Wing County acknowledged that DVS required new non-licensed peace officer employees to sign these agreements as early as 2008. (Jacobson Dep. at 81-83; Wolpert Decl. ¶ 7, Ex. F at Ex. 9 at No. 5.)  However, law enforcement officers and existing employees who already had access were not required to sign such contracts.  (Jacobson Dep. at 95-96; Elder Dep. at 249-50.)  The

Crow Wing County Sheriff's Office Administrative Manager recalled such contracts being required starting in 2009 or 2010 and explained that "[i]t was very minimal the number of employees that I had to sign on to any type of contract." (Elder Dep. at 249-50.) The four remaining Individual County Defendants were employed by Crow Wing County in 2007 or earlier. Although Ramm explained that she did not obtain DVS access until sometime within the first three years following her employment in 2006, (Ramm Dep. at 21-22), the Crow Wing County Attorney could not say whether Ramm had ever signed such a contract to access the database (Ryan Dep. at 107-09). A jury seeking to impose punitive damages based on these contracts would be required to speculate that such contracts were ever seen or signed by the Individual County Defendants. Consequently, even when viewed in the light most favorable to Plaintiff, this evidence does not create a genuine issue of material fact regarding whether the Individual County Defendants willfully or recklessly violated the DPPA.

Furthermore, at the time of the accesses in question, none of the remaining Individual County Defendants had received any DVS database training from which a jury might infer that they had learned using the database for personal reasons was unlawful. (LaVoy Dep. at 44-49; Burke Dep. at 36-37; Edberg Dep. at 47-50, 77; Ramm Dep. at 33-35, 100.) In fact, multiple defendants testified that they initially believed it was permissible to use the DVS database for personal reasons on occasion until they began to hear about lawsuits being brought against individuals engaging in such use. For example, Edberg described a culture change within her office after hearing about lawsuits in the news, and explained "[T]hat's about the time everybody started talking about, 'Hey, It's

51

probably not okay to look up your grandma or your own name.'" (Edberg Dep. at 78.)

She stated, "I think it was around that time that I realized that people could actually get in

trouble for that." (*Id.* at 79.)  Burke similarly testified to a culture change within the

office following the news of lawsuits involving DVS database misuses, and he recalled

this taking place in 2011 or 2012.  (Burke Dep. at 48-51.)  Ramm testified that it was

only within the last three years prior to her deposition (since 2013) that she realized she

was not allowed to look up herself or relatives using the DVS database in light of

information put out by the State.  (Ramm Dep. at 98-100.)  In sum, based on the lack of

evidence that any of the Individual County Defendants were trained on the laws

governing their use of the DVS database and the testimony by multiple defendants

suggesting that they initially believed personal use was permissible, there is not enough

evidence in the record to conclude that the Individual County Defendants willfully or

recklessly disregarded the law.

The Court has thoroughly reviewed the evidence, and—even viewing the facts in

the light most favorable to Plaintiff—the record simply does not support a punitive

damages award.  Thus, the Court concludes that the Moving Defendants are entitled to

summary judgment on Plaintiff's punitive damages claim.

## VII.   Defendants' Request for Sanctions

Finally, the Moving Defendants ask the Court to impose sanctions against Plaintiff

based on the manner in which Plaintiff filed her responsive pleadings to the Moving

Defendants' Motion.  First, the Moving Defendants assert that Plaintiff violated Local

Rule 7.1(c)(2) by failing to file and serve her Memorandum of Law in a timely manner.

According to the Moving Defendants, although Plaintiff filed a placeholder on the docket by the filing deadline indicating that her Memorandum of Law had been filed under seal, the document was not conventionally filed or served on time.  Second, the Moving Defendants state that Plaintiff violated the Protective Order in this case and the Electronic Case Filing Procedure Guide for Civil Cases as they relate to filing documents under seal. In particular, the Moving Defendants assert that Plaintiff filed her entire memoranda, affidavit, and exhibits under seal without first obtaining the Court's leave or establishing good cause.  Third, the Moving Defendants point out that Plaintiff did not file a certificate of brief length as required by Local Rule 7.1(f).

When a party violates the Local Rules, the court may exercise its discretion and "impose appropriate sanctions as needed to protect the parties and the interests of justice."  L.R. 1.3.  The court may also exercise its inherent power to impose sanctions when a party violates a protective order.  *See Greiner v. City of Champlin*, 152 F.3d 787, 789-90 (8th Cir. 1998); *see also Sandoval v. Am. Bldg. Maint. Indus., Inc.*, 267 F.R.D. 257, 264 (D. Minn. 2007) ("[V]iolations of the protective order's provisions are subject to the full range of sanctions available pursuant to the Federal Rules of Civil Procedure and the inherent power of the court." (quoting *Excellus Health Plan, Inc. v. Tran*, 222 F.R.D. 72, 73 (W.D.N.Y.2004))).

Here, however, the Court concludes that sanctions are not warranted based on Plaintiff's conduct in filing her responsive pleadings.  Although the Court is troubled by Plaintiff's apparent disregard for the Local Rules, Electronic Case Filing Procedures, and the Protective Order, absent any showing of prejudice to the Moving Defendants, the

Court declines to impose sanctions.  Nonetheless, the Court urges Plaintiff to carefully review and apply the relevant rules and governing orders prior to subsequent filings in this matter.  The Court reserves the right to impose appropriate sanctions should Plaintiff engage in similar conduct in the future.

## CONCLUSION

Although Plaintiff has standing to pursue her DPPA claims, numerous claims against Individual County Defendants are barred by the statute of limitations and the failure of Plaintiff's First and Second Amended Complaints to relate back to the date of her original Complaint under Rule 15(c).  With respect to the remaining Individual County Defendants, the Court concludes that Defendants Smith and Wussow are entitled to qualified immunity, but genuine issues of material fact preclude such a finding with respect to Defendants LaVoy, Burke, Edberg, and Ramm.  Furthermore, the Court concludes that the Entity County Defendants may be held vicariously liable for the Individual County Defendants' accesses.  Given the remaining timely claims, however, the sole Moving Entity Defendant against which Plaintiff continues to have a viable claim is Crow Wing County.  In light of the narrowed set of claims at issue in this matter, the Court believes that settlement would serve the interests of all parties.

## ORDER

Based on the files, record, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      The Moving Defendants' Joint Motion for Summary Judgment (Doc. No. [337]) is **GRANTED IN PART AND DENIED IN PART** as follows:

a.      The Motions are **GRANTED** with respect to DPPA claims
against the Moving Defendants that relate to lookups that occurred before
November 5, 2010 (for Defendants first named in the First Amended
Complaint) or March 18, 2011 (for Defendants first named in the Second
Amended Complaint).  Such claims are **DISMISSED WITH
PREJUDICE**.

b.      In light of 1(a), above, the following Moving Defendants are
**DISMISSED** from this lawsuit:  Ginger Heurung, Michael Triplett,
Christine Madsen, Dawn Chouinard, Ryan Barnett, Laura Johnson, Deb
Nelson, Colleen Berens, Gary Gutenkauf, Karri Turcotte, Jon Vukelich.

c.      The Moving Defendants' request to strike Plaintiff's
Declaration in opposition to the Moving Defendants' Motion for Summary
Judgment is **DENIED**.  The Moving Defendants' objections relating to this
document are **OVERRULED**.

d.      The Moving Defendants' Motion for Summary Judgment is
**GRANTED** with respect to Plaintiff's claim relating to the May 4, 2011
access by Defendant Joan Smith, and Defendant Cass County may not be
held vicariously liable for the February 2, 2011 access by Defendant Derek
LaVoy.  Defendants Joan Smith and Cass County are **DISMISSED** as a
result.

e.      The Moving Defendants' Motion for Summary Judgment is
**GRANTED** with respect to Plaintiff's claims relating to the June 21, 2012

55

and September 5, 2012 accesses by Defendant Shannon Wussow.

Defendants Shannon Wussow and CMCC are **DISMISSED** as a result.

      f.      The Moving Defendants' Motion for Summary Judgment is

**GRANTED** with respect to the availability of punitive damages.  Plaintiff

is not entitled to submit the issue of punitive damages to a jury on this

record.

      g.      The Moving Defendants' request for sanctions is **DENIED**.


Dated:  February 2, 2017                s/Donovan W. Frank
                                       DONOVAN W. FRANK
                                       United States District Judge