# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Brook Mallak,

        Plaintiff,

v.

City of Brainerd; Crow Wing County; City of Fridley;
City of Staples; City of St. Cloud; Anthony Runde,
acting in his individual capacity as an Officer
of the Brainerd Police Department; Perry Jones,
acting in his individual capacity as a Detective
for the Fridley Police Department; David Darling,
acting in his individual capacity as an Officer of
the St. Cloud Police Department; Tyler Burke,
acting in his individual capacity as an employee
of the Crow Wing County Sheriff's Office;
Amy Edberg, acting in her individual capacity
as an employee of the Crow Wing County
Sheriff's Department; Ryan Goff, acting in his
individual capacity as a corrections officer for
the Crow Wing County Sheriff's Office and in
his individual capacity as an Officer of the City
of Staples Police Department; Derek LaVoy, acting
in his individual capacity as an investigator for the
Crow Wing County Sheriff's Office; Illissa
Ramm, acting in her individual capacity as an
Assistant County Attorney in the Crow Wing
County Attorney's Office; John and Jane
Does (1 - 500) acting in their individual capacity
as supervisors, officers, deputies, staff, investigators,
employees or agents of the other law-enforcement
agencies; and Entity Does (1-50) including cities,
counties, municipalities, and other entities sited in
Minnesota and federal departments and agencies,

        Defendants.

Civil No. 13-2119 (DWF/LIB)

**MEMORANDUM
OPNION AND ORDER**

Jonathan A. Strauss, Esq., Lorenz F. Fett, Jr., Esq., Sonia L. Miller-Van Oort, Esq., and Robin M. Wolpert, Esq., Sapientia Law Group PLLC, counsel for Plaintiff.

Jon K. Iverson, Esq., Susan M. Tindal, Esq., and Stephanie A. Angolkar, Esq., Iverson Reuvers Condon, counsel for Defendants City of Brainerd, City of Fridley, City of St. Cloud, City of Staples, Anthony Runde, Perry Jones, and David Darling.

Erin E. Benson, Esq., Margaret A. Skelton, Esq., and Timothy A. Sullivan, Esq., Ratwik, Roszak & Maloney, PA, counsel for Defendant Crow Wing County.

Jason M. Hill, Esq., Jardine, Logan, & O'Brien, P.L.L.P., and Margaret A. Skelton, Esq., Ratwik Roszak & Maloney, PA, counsel for Defendants Tyler Burke, Amy Edberg, Derek LaVoy, Illissa Ramm.

Jason M. Hill, Esq., and Robert I. Yount, Esq., Jardine, Logan, & O'Brien, P.L.L.P., Jon K. Iverson, Esq., Iverson Reuvers Condon, and Margaret A. Skelton, Esq., Ratwik Roszak & Maloney, PA, counsel for Defendant Ryan Goff.

## INTRODUCTION

This matter is before the Court on Motions for Summary Judgment by Defendants Anthony Runde, David Darling, Perry Jones, and the Cities of Brainerd, Fridley, St. Cloud, and Staples (collectively, "City Defendants"), and Ryan Goff (altogether, "Moving Defendants"). (Doc. Nos. 376, 383.) For the reasons set forth below, the Court grants in part and denies in part the City Defendants' motion and grants Ryan Goff's motion.

## BACKGROUND

### I. General Background

Plaintiff Brook Mallak's ("Plaintiff") case relates to the alleged improper access of her driver's license information, which is maintained in a database with the Department

of Vehicle Services ("DVS"), a division of the Department of Public Safety ("DPS"). Plaintiff claims that the improper access of her information violated the Driver's Privacy Protection Act ("DPPA") and included access to such information as her name, date of birth, driver's license numbers, addresses, driver's license photos, weight, height, social security number, various health and disability information, and eye color.

Plaintiff received an audit report from DPS in 2013, at which time she learned that her driver's license information had been "repeatedly accessed" by numerous law enforcement entities. (Doc. No. 145 ("Mallak Aff.") ¶ 23; Doc. No. 379 ("Angolkar Aff.") ¶ 22, Ex. 21 ("Jacobson Dep.") at 135-36.) The lookups of Plaintiff's information were run by Plaintiff's name or driver's license number rather than by her license plate number. (Jacobson Dep. at 138-39.) The accesses were conducted on government entity computers. (*Id.* at 138.)

Plaintiff is a practicing attorney in Brainerd and Little Falls, Minnesota. (Mallak Aff. ¶ 1.) Plaintiff was a full-time public defender between 2003 and 2008 in Crow Wing and Aitkin Counties. (*Id.* ¶ 3.) She continues to practice criminal defense in the private sector. (*Id.* ¶ 9.) Plaintiff has also served on the Crow Wing County Drug and DWI Courts and a number of steering committees, has volunteered with numerous community organizations, and has taught as an adjunct teacher at Bemidji State University. (*Id.* ¶¶ 5-8.) Plaintiff is familiar with "several people within the Crow Wing County justice system" and asserts that she is known throughout her community due to her "career and community involvement." (*Id.* ¶¶ 9, 16.)

As the Court explained in a previous Order, Plaintiff has had a number of interactions with law enforcement, contrary to the representations in her original complaint.[1] (*See* Doc. No. 199 at 4-5.) In particular, Plaintiff's child was reported unresponsive to the Brainerd police on July 6, 2010. (Mallak Aff. ¶ 14.) The child passed away on July 12, 2010. (*Id.*) The Brainerd Police Department conducted an investigation into the child's death due to the nature of the circumstances surrounding it. (*Id.* ¶ 15.) The autopsy indicated that the child had passed away from natural causes. (*Id.* ¶ 18.) Plaintiff asserts that the tragedy of her son's death was known throughout the Brainerd community. (*Id.* ¶ 16.)

Plaintiff has also had other interactions with law enforcement relating to a reported theft of her motor vehicle, a trespassing incident, a hit and run vehicle accident, a welfare check, and various traffic stops. (Doc. No. 111 ("McQuiston Aff.") ¶ 7; Mallak Aff. ¶ 31; Angolkar Aff. ¶ 3, Ex. 2 ("First Mallak Dep.") at 145-49, 165-67.) Excluding the investigation relating to her son's death, Plaintiff asserts that she has never been under investigation by Defendants. (Mallak Aff. ¶ 19.) She also states she has "never been charged with any crimes." (*Id.* ¶ 20.)

Plaintiff was in a relationship with an individual referred to as S.M.S. from mid-August 2009 to mid-November 2010. (*Id.* ¶ 13.) During this time, S.M.S. lived at Plaintiff's home and occasionally drove Plaintiff's vehicles. (*Id.*; First Mallak Dep.

---

[1]     Initially, Plaintiff alleged that she was not involved in an investigation or any law enforcement-related activities that could justify the use of the DVS Database for the access of her information. (Doc. No. 1 ("Compl.") ¶¶ 151-53.)

at 92-95.)  When Plaintiff and S.M.S. ended their relationship, Plaintiff gave S.M.S. a

Honda Accord.  (First Mallak Dep. at 95.)  S.M.S. has a long criminal history, has been

on probation, and has acted as a confidential informant for the Crow Wing County

Sheriff's Office.  (*Id.* at 96-98, 106, 115-16.)  Plaintiff has not seen S.M.S. since

November 2010 and was not aware that S.M.S. was a confidential informant.  (Mallak

Aff. ¶ 13; First Mallak Dep. at 106, 117; Angolkar Aff. ¶ 2, Ex. 1 ("Second Mallak

Dep.") at 53-54, 113.)  When S.M.S. lived with Plaintiff, he was not under probationary

supervision.  (First Mallak Dep. at 106-07.)

Plaintiff claims to have suffered emotional distress in connection with her DPPA

claims as well as out-of-pocket expenses such as the cost of installing an alarm system

and hiring a private investigator.  (*Id.* at 156-65, 205-19.)  When Plaintiff received her

DPS audit and reviewed the accesses of her information, she "felt physically ill,"

"nauseated," "upset," and "angry."  (Second Mallak Dep. at 41-42.)  When Plaintiff

learned the identity of some of the individuals who accessed her DPS record, she "was

shocked" due to her "personal and professional relationships with some of them."

(Mallak Aff. ¶ 28.)  Plaintiff asserts that receiving the audit led her to feel nervous that

she was being watched.  (Second Mallak Dep. at 88-91.)  Since filing her lawsuit,

Plaintiff reports that she feels targeted, fears for her safety, fears retaliation, and worries

that police will be unresponsive if she calls.  (First Mallak Dep. at 215-16.)  She also

reports having intruders come to her home since filing this lawsuit, causing her to fear for

her personal safety.  (*Id.* at 159-65, 205-12.)  Plaintiff has not seen any medical or mental

health professionals or been diagnosed with a particular condition in connection with her emotional distress. (*Id.* at 156-57; *see also* Second Mallak Dep. at 101.)

## II. Procedural History

In March 2014, the Court ruled on a number of motions to dismiss in this case. The Court dismissed all DPPA claims outside of a four-year statute of limitations, all Section 1983 claims, and all invasion of privacy claims. (*See generally* Doc. No. 89.) However, the Court also held that Plaintiff's claim for violations of the DPPA (Count I) could proceed against multiple city and county defendants. (*See id.*)

Plaintiff has twice amended her Complaint to replace Doe defendants with named defendants. (*See generally* Doc. No. 193 at 3-10 (summarizing the procedural history underlying these amendments).) On June 30, 2014, Plaintiff requested discovery from the city and county defendants, and the defendants responded. (*See* Doc. No. 150 ("Strauss Aff.") ¶¶ 3-4.) In light of the city and county defendants' discovery responses, Plaintiff filed a First Amended Complaint on November 5, 2014, replacing individual Doe defendants with specific, named individuals. (Doc. No. 167, First Am. Compl. ("FAC").) Plaintiff filed a Second Amended Complaint on March 18, 2015, replacing additional Doe defendants. (Doc. No. 195, Second Am. Compl. ("SAC").) Relevant to the motions currently before the Court, Plaintiff's First Amended Complaint added the following named Defendants: Anthony Runde, Perry Jones, David Darling, and Ryan Goff. (*See generally* FAC.)

In March 2015, the Court granted in part a Motion for Summary Judgment brought by six Defendant cities. (*See* Doc. No. 199.) For five accesses, the Court determined that

Plaintiff's record was indisputably accessed by law enforcement officers for a permissible reason. Thus, with respect to these accesses, there was no DPPA violation, and the cities were entitled to qualified immunity. (*See id.* at 16-18.) However, for five other accesses, the Court concluded that a genuine issue of material fact remained regarding whether Plaintiff's record was accessed for a permissible purpose, and the cities were not entitled to summary judgment. (*Id.* at 18-19.) The Court outlines evidence specific to each of the accesses relevant to the pending motions, below.

## III. Individual Accesses

### A. Anthony Runde (September 8, 2009)

Anthony Runde ("Runde") accessed Plaintiff's information on September 8, 2009 at 10:49 a.m. (Angolkar Aff. ¶ 21, Ex. 20 ("48-Hour Audit"); Angolkar Aff. ¶ 6, Ex. 5 ("Runde Dep.") at 69-71.) Runde has been a patrol officer for the Brainerd Police Department since May 2008. (Runde Dep. at 6.) Runde had access to the DVS database from the start of his position, and he understood it was not to be used "for personal reasons." (*Id.* at 34-35.) He used the DVS database for multiple reasons such as to look up driver's license status, create photo lineups, conduct investigations, look up driving records, and check for warrants. (*Id.* at 40-44.) He testified that he never used the DVS database for personal reasons such as to look up friends or family, or to look up colleagues "out of curiosity." (*Id.* at 58-59.) He explained that he looked up his own DVS record when he was having connectivity issues which happened once every few years. (*Id.* at 61-63.) Runde testified that he accessed the DVS database from the police department and his squad cars and never on his home computer. (*Id.* at 61.)

Runde and Plaintiff were both on the DWI Court Team. (Mallak Aff. ¶ 32; First Mallak Dep. at 122; Second Mallak Dep. at 61-62; Runde Dep. at 16-17, 24-25, 66.) Plaintiff explained that she and Runde knew each other professionally but did not spend time together outside of DWI Court. (Second Mallak Dep. at 62-63.) Plaintiff testified that she "felt like [she and Runde] had a trusting, professional relationship." (*Id.* at 122-23.)

Plaintiff chose to resign from the DWI Court and Drug Court Teams when she began her relationship with S.M.S. (First Mallak Dep. at 128-29.) She sent her letter of resignation on August 31, 2009. (Angolkar Aff. ¶ 7, Ex. 6; Runde Dep. at 79-80.) Runde could not recall when he became aware that Plaintiff was resigning from DWI Court, but he knew she did so due to her relationship with S.M.S. (Runde Dep. at 80-81.) Runde looked up Plaintiff's information just over one week after Plaintiff's resignation from the DWI Court Team. (Angolkar Aff. ¶ 7, Ex. 6; *see also* Mallak Aff. ¶ 32; First Mallak Dep. at 128.)

Runde has arrested S.M.S. on multiple occasions since 2006 or 2007, and he explained that "[h]e is very well known to me as someone that I have dealt with numerous times." (Runde Dep. at 73-74.) Runde testified that he did not know that S.M.S. had graduated from Drug Court. (*Id.* at 73-74, 78, 87.) He could not recall when he first learned S.M.S. and Plaintiff were in a relationship, but he testified that it was some time before his September 8, 2009 lookup of her information, and he "was very concerned" and worried "that maybe [Plaintiff] was falling into a trap." (*Id.* at 81-83, 91.)

Runde's Officer Log demonstrates that he was on patrol on September 8, 2009 at the time of the lookup.  (*See* Angolkar Aff. ¶ 8, Ex. 7; Runde Dep. at 115-16.)  He used the City of Brainerd's computer to look up her information while he was in a City of Brainerd squad car.  (Angolkar Aff. ¶ 18, Ex. 17 ("McQuiston Dep.") at 103-05; Doc. No. 392 ("Strauss Decl.") ¶ 4, Ex. B at 4.)  The most recent recorded activity preceding Runde's lookup of Plaintiff's record is a medical emergency call at 9:53 a.m.  (*See* Angolkar Aff. ¶ 8, Ex. 7; Runde Dep. at 115-16.)  Following Runde's lookup of Plaintiff's information, the Officer Log shows that Runde responded to a civil problem at 12:02 p.m.  (Angolkar Aff. ¶ 8, Ex. 7; Runde Dep. at 119-20.)  Between 9:53 a.m. and 12:02 p.m., Runde did not make any traffic stops.  (Runde Dep. at 121.)  There are no log entries particularly connected with Plaintiff or the time of Runde's access of her information.  (*See generally* Angolkar Aff. ¶ 8, Ex. 7; *see also* Runde Dep. at 98-99.)  The City of Brainerd has no record of any citations, warrants, arrests, or 911 calls involving Plaintiff on September 8, 2009.  (McQuiston Dep. at 48-50.)  Brainerd Chief Corky McQuiston testified that he was not aware of any records of investigations relating to S.M.S. or Plaintiff at the time.  (*Id.* at 81-82.)  In his deposition, Runde stated, "I am certain that [Plaintiff] was in her vehicle and driving somewhere in Brainerd" on September 8, 2009 at 10:49 a.m.  (Runde Dep. at 84; *see also id.* at 133.)  He explained that he wanted to look up Plaintiff's driver's license to confirm that it was valid because he had heard about Plaintiff's relationship with S.M.S.  (*Id.* at 85, 129-33.)  According to Runde:

> If she doesn't have a valid driver's license, it would be the basis of a traffic stop and potential investigation into . . . You know. Based upon [S.M.S]'s history, I know that he has been, you know, into drugs. And based upon his history, you know, she quite possibly could be into that, as well.

(*Id.* at 85; *see also id.* at 86-88.) Runde also explained how he had looked up two other individuals that morning who were involved with drugs and suggested that this may have caused him to look into S.M.S. and Plaintiff. (Runde Dep. at 104, 124-32; *see also* Doc. No. 136 ("Runde Aff.") ¶ 8.) At the time of the lookup, Runde was not working as an investigator. (Runde Dep. at 92.) When asked if he looked up Plaintiff and S.M.S. out of curiosity based on hearing about their relationship, Runde responded, "Absolutely not. No." (*Id.* at 98; *see also* Runde Aff. ¶ 3.)

Plaintiff does not know why Runde accessed her information. (Second Mallak Dep. at 64.) Her calendar and court records reflect that she was in Crow Wing County District Court which is located in Brainerd, Minnesota on September 8, 2009 for a 9:00 a.m. pre-trial hearing. (*Id.* at 57-61; *see also* Angolkar Aff. ¶ 4, Ex. 3; Angolkar Aff. ¶ 5, Ex. 4.) Plaintiff does not know exactly where she was at 10:49 a.m. that morning, and she acknowledged that she would have driven in Brainerd that day in her Honda Accord. (Second Mallak Dep. at 57, 63-64.)

On September 8, 2009, Runde accessed S.M.S.'s DPS record at 10:48 a.m., one minute prior to accessing Plaintiff's record. (48-Hour Audit.) He also accessed S.M.S.'s ex-wife the same minute he accessed Plaintiff. (*Id.*; Doc. No. 393 ("Second Mallak Decl.") ¶ 4.) Earlier that morning, he had accessed his own record as well as a

Crow Wing County dispatcher's.  (48-Hour Audit; *see also* Runde Dep. at 68; Second Mallak Decl. ¶ 4.)

## B.    David Darling (July 11, 2010)

David Darling ("Darling") accessed Plaintiff's DVS record on July 11, 2010 at 7:11 p.m.  (48-Hour Audit.)  Darling has worked for the City of St. Cloud as a patrol officer since February 2008.  (Angolkar Aff. ¶ 9, Ex. 8 ("Darling Dep.") at 8.)  In this position, Darling responds to calls, makes traffic stops, writes reports, and conducts follow-up.  (*Id.* at 12.)  Darling testified that "[p]retty much all of" his work is done in his squad car, and he accessed the DVS database from the computer in his vehicle.  (*Id.* at 9, 12.)  Darling explained that he runs license plate number lookups while on patrol.  (*Id.* at 19.)  He stated that he does so to check for stolen vehicles, the validity of driver's licenses, warrants, or court orders in connection with vehicles.  (*Id.* at 20.)  Darling explained that he used a photo lookup in the DVS database because "[i]t was faster . . . [y]ou would just copy, paste, and then everything would pull up in the photo search." (*Id.* at 35; *see also id.* at 36-37.)  He understood that the DVS database was to be used for law enforcement purposes.  (*Id.* at 47-48; *see also id.* at 61-62.)  Darling admitted that he had used the DVS database for personal reasons and had faced an investigation in 2011 for his DVS use.[2]  (*Id.* at 48-49.)

---

[2]    The Court has reviewed the evidence in the record relating to this investigation, but declines to recite the details because much of the relevant evidence has been redacted from the public record or filed under seal.  (*See* Angolkar Aff. ¶ 9, Ex. 8 ("Darling Dep.") at 51-52, 55; Angolkar Aff. ¶ 10, Ex. 9 ("Oxton Dep.") at 60, 124-25, 127-28, 139-40, 145; Strauss Decl. ¶ 8, Ex. F.)

Darling testified that he did not know Plaintiff and has not met her. (*Id.* at 6, 82.) He stated he was not aware Plaintiff's son was in the hospital in St. Cloud on July 11, 2010, and did not know about the circumstances relating to his hospitalization. (*Id.* at 82.) He asserts that he did not look up Plaintiff's information "for personal reasons or out of personal curiosity." (Doc. No. 121 ("Darling Aff.") ¶ 7.)

Darling was on patrol duty when he looked up Plaintiff's DVS record. (Angolkar Aff. ¶ 10, Ex. 9 ("Oxton Dep.") at 73-74.) At the time, Plaintiff was at the hospital in St. Cloud with her son. (Mallak Aff. ¶ 40; Second Mallak Dep. at 70-71.) Plaintiff's son was removed from life support on July 12, 2010. (First Mallak Dep. at 199-200.) Darling was assigned to patrol a beat in a part of town separate from where the hospital was located. (Oxton Dep. at 74-75, 198-99.) However, officers could leave their assigned beats during a shift. (*Id.* at 79.) Darling does not specifically recall the purpose for his lookup of Plaintiff's record, but he testified that records show that he ran a license plate lookup followed by a photo-only lookup of Plaintiff's DVS record. (Darling Dep. at 44, 66-67, 83.) Darling concluded that he looked up Plaintiff's license plate "[p]robably because it was in front of me on a public street." (*Id.* at 43.) None of the service calls reported on Darling's call log entries involved Plaintiff. (*Id.* at 45.) Darling testified that he did not look up Plaintiff in connection with a photo lineup, personal service, or an investigation. (*Id.* at 64-65.)

St. Cloud Assistant Chief Jeffrey Oxton ("Oxton") also testified that the City of St. Cloud had no information relating to Plaintiff being involved in a photo lineup, personal service, or an investigation. (Oxton Dep. at 110-13.) The City of St. Cloud's

only record of contact with Plaintiff was a gun permit application from 2003 unrelated to Darling's 2009 lookup.  (*Id.* at 91-93.)  Records obtained by Oxton and by Plaintiff's counsel via Westlaw verify that Darling looked up a license plate associated with Mallak's Honda Accord on July 11, 2010 at 7:10 p.m.[3]  (*Id.* at 211-13; *see also* Angolkar Aff. ¶ 15, Ex. 14; Angolkar Aff. ¶ 16, Ex. 15; Angolkar Aff. ¶ 17, Ex. 16.)  Based on GPS records, Oxton testified that Darling ran the license plate and then Plaintiff's DVS record while driving.  (Oxton Dep. at 94-95, 204; *see also* Angolkar Aff. ¶ 13, Ex. 12.)  Darling's call log entries and chat records also indicate that he was in between writing reports and going to lunch when he ran Plaintiff's records.  (*Id.* at 169, 187-92; 202-10; *see also* Angolkar Aff. ¶ 11, Ex. 10; Angolkar Aff. ¶ 14, Ex. 13.)

Oxton testified that in general a proactive officer "might run plates consistently" and "may run DVS inquiries to see pictures of people if people come back suspended or revoked or with warrants to confirm what those people look like."  (Oxton Dep. at 53.)  He explained that "[o]fficers working traffic control might run every plate that comes toward them or every plate that they're following in order to look for violations of registration or licensing or warrants, and it's a very common practice."  (*Id.*)  Oxton also explained how officers would conduct DVS lookups "right away" in conjunction with a

---

[3]    A current license plate lookup cannot verify the specific information Darling would have obtained through a license plate lookup on July 11, 2010 because the records have since been updated in the relevant database.  A Westlaw motor vehicle record produced by the City Defendants, however, shows that a Honda Accord with the same license plate Darling looked up—"ZT975"—was registered to "Brook Mallak Law Office PA" since May 28, 2009 with a renewal date of April 12, 2010.  (Angolkar Aff. ¶ 10, Ex. 9 ("Oxton Dep.") at 211-37; Angolkar Aff. ¶ 16, Ex. 15.)

license plate lookup in a separate database to visually verify identities of drivers. (*Id.* at 102-03.)

In light of records showing Darling's license plate lookups from July 11, 2010, Oxton testified, "I would say he runs a lot of plates . . . consistent with someone doing a lot of traffic enforcement." (*Id.* at 212.) Based on the information he reviewed and his experience, Oxton assumed Darling's July 11, 2010 lookup of Plaintiff's record was conducted in the scope of his patrol duties to confirm the identity of the person driving Plaintiff's vehicle. (*Id.* at 95, 102-05; *see also id.* at 225-27, 231-32.) Darling's call log did not indicate any particular reason why he may have looked up Plaintiff's DVS record that day. (*Id.* at 192.)

Plaintiff testified that she has not met Darling. (Second Mallak Dep. at 98-99.) When questioned about Darling's access, Plaintiff stated, "When I look at the date and time that David Darling did his access, I can remember what I was doing at that time. We were trying to get ready to have our son die." (*Id.* at 120.) She explained, "When I saw that and thought about somebody was snooping into my information for whatever reason because they had access, that hurts a lot, compiling that with what was going on." (*Id.* at 120.) Plaintiff asserts that she did not have any contact with St. Cloud law enforcement personnel on July 11, 2010. (Mallak Aff. ¶ 40; *see also* Strauss Decl. ¶ 9, Ex. G at 12.) At the time, Plaintiff had given S.M.S. her Honda Accord to drive. (Second Mallak Dep. at 72, 75-76.)

### C.     Ryan Goff (December 6, 2010)

Ryan Goff ("Goff") accessed Plaintiff's DVS record on December 6, 2010 from 9:44 p.m. to 9:45 p.m.[4]  (48-Hour Audit.)  Goff worked full-time as a corrections officer for the Crow Wing County Jail and part-time as a patrol officer for the City of Staples from 2008 until 2012.  (Angolkar Aff. ¶ 19, Ex. 18 ("Goff Dep.") at 17-18, 28-30, 33.) He believes his access of Plaintiff's DVS record took place while he was working his typical 6:00 p.m. to 6:00 a.m. night shift at the Crow Wing County Jail.  (*Id.* at 31, 110-11.)  The City of Staples has confirmed that Goff was not working for Staples on December 6, 2010.  (Angolkar Aff. ¶ 20, Ex. 19 ("Birkholtz Dep.") at 62-63; *see also id.* at 91-92.)

In his position at the Crow Wing County Jail, Goff's primary duty was "ensur[ing] the safety and the security of the facility."  (Goff Dep. at 30-31.)  This involved processing visitors to the jail through the booking area, including attorneys.  (*Id.* at 36.) He explained that during his shift most visitors would use the public entrance rather than the entrance connected to the judicial center.  (*Id.* at 36-37.)  The judicial center was closed by the start of his shift at 6:00 p.m., and if attorneys visited, it would commonly be toward the start of his shift.  (*Id.* at 36-38.)

Goff obtained DVS access through the City of Staples at the start of his position, and he understood that it was not to be used "for personal reasons."  (*Id.* at 22; *see also*

---

[4]     The Eighth Circuit recently clarified that "sequential accesses occurring within a several-minute time span should be considered as one obtainment rather than several." *Tichich v. City of Bloomington*, 835 F.3d 856, 867 (8th Cir. 2016).  Thus, the Court will treat Goff's December 6, 2010 access as one obtainment of Plaintiff's record.

*id.* at 77.) He did not obtain separate DVS access credentials from Crow Wing County.

(*Id.* at 41-43.) According to Goff, "I had never pursued that because I already had a login

with the City of Staples." (*Id.*at 42.) He was never instructed not to use his login from

his other employment while working for Crow Wing County. (*Id.* at 42-43.) Goff was

not required to obtain DVS access as a corrections officer at Crow Wing County, but he

used the DVS database in his position "to verify identities" of individuals visiting the jail.

(*Id.* at 42, 45; *see also id.* at 55-56.) Goff testified that Crow Wing County corrections

officers could obtain a DVS login for this purpose. (*Id.* at 42.) Goff testified that he used

the DVS database for personal use to search for family members "less than five" times.

(*Id.* at 26, 28.) He explained that he has not accessed the DVS database from a personal

computer. (*Id.* at 27.)

Goff believes he accessed Plaintiff's DVS record on December 6, 2010 in order

"to verify her identity" when she visited the jail after hours to meet with an inmate. (*Id.*

at 46-52, 58.) He does not have a specific recollection of accessing Plaintiff, but he

remembers an incident around that time where a female attorney with dark hair visited

the jail after hours using the judicial entrance. (*Id.* at 46-52.) Goff described it as "an

odd occurrence," and the situation stood out in his mind because it was not common

during his shift for attorneys to visit or come through the judicial entrance. (*Id.* at 47,

50-51, 58.) In fact, this was the only time he could recall an attorney using that entrance.

(*Id.* at 53-54.) He testified that he did not recognize the woman and had never heard of

Plaintiff prior to December 6, 2010. (*Id.* at 52-53, 57-58.) Goff denies looking up

Plaintiff's information "for personal reasons or out of personal curiosity." (Doc. No. 120 ("Goff Aff.") ¶ 9.)

Goff testified that a Crow Wing County training module required him to "[e]nter all activities in the shift log including . . . visits by . . . attorneys." (Goff Dep. at 86-87, 92-93; *see also id.* at 112.) Goff was unaware of any documentation on a shift log relating to the encounter he believes involved Plaintiff. (*Id.* at 96.) He believes he used a Crow Wing County Jail computer to facilitate the December 6, 2010 access of Plaintiff's DVS record. (Strauss Decl. ¶ 7, Ex. E at 4.)

When asked if she knew Goff, Plaintiff stated, "No, I don't think so." (First Mallak Dep. at 91.) Plaintiff further testified, "I think he works at the jail." (*Id.*) Ultimately, Plaintiff explained that "[she] might know [Goff] if [she] saw him," but she did not believe she "[knew] him outside of the jail." (*Id.*; Second Mallak Dep. at 151-52.) Plaintiff asserts that she would use the public entrance when visiting the Crow Wing County Jail after hours. (Mallak Aff. ¶ 43.) Plaintiff explained that if she were to visit the jail after hours, she would call ahead to inform someone that she was coming. (Second Mallak Dep. at 147-49.) Plaintiff explained that she was not sure how Crow Wing County jail personnel would verify her identity when she arrived at the jail to meet with clients and used the entrance from the courthouse. (First Mallak Dep. at 58-63.) According to Plaintiff, there was a sign-in log for visitors who entered the jail using the public entrance, although she could not recall specifically when the sign-in log requirement was implemented. (*Id.* at 63-64.) Plaintiff testified that she has "never provided [her] driver's license to enter the jail." (*Id.* at 70.) According to Plaintiff, she

only ever provided her driver's license in order to complete a new required visitor form in 2012 or 2013. (*Id.* at 69-70.)

Plaintiff's calendar reflects that on December 6, 2010, she had been invited to a Christmas event to be held at 6:30 at the funeral home where her son's funeral service was held. (Second Mallak Dep. at 144-46; *see also* Strauss Decl. ¶ 6, Ex. D.) Plaintiff does not recall if she in fact attended this event, and she explained that "I don't know that I felt like I could go to something like that at that point." (Second Mallak Dep. at 146.) Plaintiff did not recall having any clients in the Crow Wing County Jail on December 6, 2010. (*Id.*)

On December 6, 2010 at 9:46 p.m. and 9:53 p.m., Goff looked up two other individuals in the Crow Wing County community justice community, including one whom Plaintiff identified as her "close friend." (48-Hour Audit; Second Mallak Decl. ¶ 6.) Goff testified that he does not know these individuals. (Goff Dep. at 58-59.)

### D.    Perry Jones (June 28, 2011)

Perry Jones ("Jones") looked up Plaintiff's DVS record on January 28, 2009 at 6:36 a.m. and on June 28, 2011 at 6:17 a.m.[5] (48-Hour Audit; Strauss Decl. ¶ 11, Ex. I ("Jones Dep.") at 50-52.) Jones has been employed by the City of Fridley since 2007, first as a patrol officer for seven years and currently as a detective. (Jones Dep. at 22-24.)

---

[5]    Only the June 28, 2011 access supports a timely claim based on the statute of limitations, but the Court notes the prior access as it is relevant for evaluating the permissibility of the subsequent access. *See McDonough v. Anoka Cty.*, 799 F.3d 931, 946 (8th Cir. 2015) (holding that time-barred accesses may be considered to support the plausibility of timely claims).

As a patrol officer, Jones' work involved "responding to 911 calls, running traffic, [and] other street level crimes." (*Id.* at 23.) The position could also include "larger scale investigation" at times. (*Id.* at 25.) Jones received access to the DVS database through his employment with the City of Fridley, and he knew "it was not to be used for personal reasons." (*Id.* at 17, 19-20, 33.) He used the DVS database in his patrol officer position to check for warrants, driver's license status, and stolen vehicles. (*Id.* at 31.) Jones acknowledged that he had looked up family members and friends in the DVS database outside of work purposes. (*Id.* at 86-88.)

Jones was working as a patrol officer on June 28, 2011 when he looked up Plaintiff's record. (*Id.* at 54-55; *see also* Strauss Decl. ¶ 12, Ex. J ("George Dep.") at 78-79.) He conducted the lookup while in his squad car. (Strauss Decl. ¶ 13, Ex. K at 3-4.) Jones explained that he would typically run license plate records in the mornings while on patrol. (Jones Dep. at 58.) Jones does not recall why he accessed Plaintiff's DVS record. (*Id.* at 52-53.) He attests that he "did not access her motor vehicle record based on romantic interest or personal curiosity." (Doc. No. 118 ("Jones Aff.") ¶ 7.) Jones offered a number of possible reasons for accessing Plaintiff's record, including contacting her to discuss "a legal matter," to look her up in connection with S.M.S., or based on a license plate lookup. (Jones Dep. at 61-69.) The City of Fridley's representative testified that Jones did not look up any motor vehicle records in DVS on June 28, 2011, and there is no record of Plaintiff or S.M.S. being arrested or investigated by the City of Fridley on that date. (George Dep. at 90-93.) Jones did not look up S.M.S.'s DVS record on June 28, 2011. (48-Hour Audit.)

Jones and Plaintiff attended middle school and high school together, and they were friends. (Mallak Aff. ¶ 38; Second Mallak Dep. at 76-78; Jones Dep. at 40-41.) Jones testified that they kept in touch after reconnecting in 2009. (Jones Dep. at 41-42.) Plaintiff does not know what she was doing on June 28, 2011 or where she was. (Second Mallak Dep. at 114.) Plaintiff asserted that she felt "uncomfortable" at her high school reunion because it occurred after her lawsuit began, and she and Jones "had no contact." (*Id.* at 119.) Plaintiff explained, "that hurt and that stinks." (*Id.*)

Defendants Anthony Runde, David Darling, Perry Jones, the Cities of Brainerd, Fridley, St. Cloud, and Staples, and Ryan Goff now bring motions seeking summary judgment on Plaintiff's DPPA claim. (Doc. Nos. 376, 383.)

## DISCUSSION

### I. Legal Standard

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009). However, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.     Standing

City Defendants argue that Plaintiff has no standing to pursue her claims against them because she "has no actual damages attributable to these Defendants." (Doc. No. 378 at 3.) Emphasizing the current posture of the case at summary judgment, the City Defendants argue that Plaintiff cannot merely rest on allegations to support standing. The City Defendants note that "[w]here 'speculative inferences are necessary to connect [Plaintiff's] injury to the challenged actions of defendants, the injury is not fairly traceable to the challenged actions of' the defendant." (*Id.* at 33-34 (citation omitted).) The City Defendants also assert that standing cannot rest upon "an alleged increased risk of harm . . . that [is] not impending" or "speculative injury." (*Id.* at 37.) Goff also argues that Plaintiff lacks standing. Specifically, Goff argues that "Mallak had no privacy in the information Officer Goff would have viewed" because she consented to corrections officers at the Crow Wing County Jail accessing her personal information to verify her identity. (Doc. No. 385 at 22.) Alternatively, even if Plaintiff had a privacy interest,

Goff argues that Plaintiff cannot establish injury-in-fact based on the single access of her DPPA record. If the Court concludes Plaintiff asserts a viable theory of standing, the Moving Defendants all argue that the Court should hold an evidentiary hearing to determine whether such standing exists.

Plaintiff argues that she has standing to pursue her claims against the City Defendants. Specifically, she contends that she suffered the concrete injury of "emotional distress resulting from Defendants' unlawful accesses of her private data, including the feelings of hurt and betrayal stemming from the accesses by former friends and colleagues and the accessing of her information the day before her minor son passed away." (Doc. No. 391 at 45-46.) Plaintiff disputes the City Defendants' characterization of her injuries as merely hypothetical or speculative. Finally, Plaintiff argues that there is no need for an evidentiary hearing to establish standing because her deposition testimony contains sufficient facts to support standing.[6]

This Court has previously considered whether a plaintiff can establish standing by alleging a statutory violation of the DPPA along with emotional distress. *See Krekelberg v. Anoka Cty.*, Civ. No. 13-3562, 2016 WL 4443156, at *2-3 (D. Minn. Aug. 19, 2016). The plaintiff in *Krekelberg*, like Plaintiff here, alleged "that Defendants violated the DPPA by accessing her private information from the motor-vehicle records database, and

---

[6]     Goff also argues that Plaintiff has waived the issue of standing as it relates to him because she failed to respond to his argument relating to standing in her opposition brief. At oral argument, Plaintiff argued that this issue was not waived, suggesting that its resolution depends on disputed facts. The Court concludes that Plaintiff sufficiently responded to the Moving Defendants' standing arguments as a whole such that she did not waive her opposition to Goff's more specific standing argument.

that [she] experienced emotional distress as a result." *Id.* at *3. Following the analysis of another judge in this District outlined in *Potocnik v. Carlson*, Civ. No. 13-2093, 2016 WL 3919950, at *3 (D. Minn. July 15, 2016), the Court held that these allegations constituted "a concrete injury sufficient to establish Article III standing." *Krekelberg*, 2016 WL 4443156, at *3; *see also Rollins v. City of Albert Lea*, Civ. No. 14-299, 2016 WL 6818940, at *13-14 (D. Minn. Nov. 17, 2016) (following *Potocnik*); *Engebretson v. Aitkin Cty.*, Civ. No. 14-1435, 2016 WL 5400363, at *4 (D. Minn. Sept. 26, 2016) (same).

The Court adopts the analysis and holding in *Krekelberg* and holds that Plaintiff has standing to pursue her claims because she has alleged a concrete injury in the form of numerous DPPA violations and resulting emotional distress. Further, the Court rejects the City Defendants' characterization of Plaintiff's injury as hypothetical or speculative. Plaintiff has presented evidence in the form of deposition testimony and an affidavit to support her allegations of emotional distress resulting from the accesses of her DPPA record by the Moving Defendants, and the Court concludes that this evidence is sufficient at this stage to establish standing with respect to Plaintiff's claims.

Finally, the Court concludes that it need not hold an evidentiary hearing on this issue as the record provides sufficient support for Plaintiff's allegations to survive summary judgment. Plaintiff's credibility and the extent of her emotional distress injuries may be challenged by the Moving Defendants at trial. Absent conflicting factual evidence in the record, however, the Court declines to hold an evidentiary hearing to resolve the standing issue at this time. Viewing the evidence in the light most favorable

to Plaintiff, a reasonable jury could conclude that Plaintiff has suffered a concrete injury based on the alleged improper accesses of her DVS record by the Moving Defendants and resulting emotional distress. At the summary judgment stage, this showing is sufficient. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("[E]ach element [of standing] must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation.").[7]

## III. Relation Back of Plaintiff's Amended Complaint

The City Defendants argue that Plaintiff's DPPA claims against Runde and Darling are time-barred because the First Amended Complaint replacing Doe defendants with these named individuals does not relate back to the date of her original Complaint under Federal Rule of Civil Procedure 15(c). Plaintiff argues that these claims should

---

[7] The Court also rejects Goff's additional argument that Plaintiff had no valid privacy interest in the information contained in her DPPA record with respect to Crow Wing County Jail corrections officers. Plaintiff disputes that she provided her driver's license to jail officials to verify her identity, and she contends that she only provided her driver's license in connection with a jail visitor form after Goff's 2010 access of her DPPA record. Furthermore, even if Plaintiff consented to her driver's license information being viewed for the purpose of verifying her identity, Plaintiff's claim stems from the allegation that Goff viewed her record for personal reasons or curiosity and not simply to verify her identity. Thus, the harm recognized in *Potocnik* and *Krekelberg*—"viewing private information without lawful authority"—is still implicated. *Krekelberg v. Anoka Cty.*, Civ. No. 13-3562, 2016 WL 4443156, at *3 (D. Minn. Aug. 19, 2016); *Potocnik v. Carlson*, Civ. No. 13-2093, 2016 WL 3919950, at *2 (D. Minn. July 15, 2016).

relate back to the filing of the Complaint and further asserts that equitable estoppel[8] should apply to permit the claims.

DPPA claims are subject to the general four-year statute of limitations provided in 28 U.S.C. § 1658(a), and the statute of limitations begins to run when the alleged violations occur. *See McDonough v. Anoka Cty.*, 799 F.3d 931, 939-43 (8th Cir. 2015); *Mallak v. Aitkin Cty.*, 9 F. Supp. 3d 1046, 1052-55 (D. Minn. 2014). Because Plaintiff's First Amended Complaint was filed on November 5, 2014, her DPPA claims against the Moving Defendants who were first named in this complaint relating to lookups conducted prior to November 5, 2010 are time-barred unless the First Amended Complaint relates back to the original Complaint.

As the Court previously explained in its February 1, 2017 Order, the Court adopts its analysis and holding in *Krekelberg*, 2016 WL 4443156, at *3-6, and concludes that the First Amended Complaint does not relate back to the filing of the original Complaint with respect to the Doe defendants named in the subsequent complaint. *See Mallak v. City of Brainerd*, Civ. No. 13-2119, 2017 WL 440249, at *9 (D. Minn. Feb. 1, 2017). In addition, the Court again concludes equitable estoppel is not warranted. *See id.*

---

[8] In her brief, Plaintiff refers to "equitable tolling," and in support she relies on arguments made in her Memorandum of Law in Opposition to County Defendants' Motion for Summary Judgment on this issue. (*See* Doc. No. 391 at 42.) However, in that memorandum, Plaintiff argues that "equitable estoppel" should apply—not equitable tolling. (*See* Doc. No. 348 at 79 n.16.) Although these terms are frequently used interchangeably, the distinction is not without a difference. *See Kampschroer v. Anoka Cty.*, Civ. No. 13-2512, 2017 WL 3309674, at *8 (D. Minn. Aug. 2, 2017). Here, the Court construes Plaintiff's argument as one for the application of equitable estoppel.

Because Plaintiff's Amended Complaint does not relate back under Rule 15(c) and equitable estoppel does not apply, the statute of limitations bars claims against the Moving Defendants regarding lookups that occurred before November 5, 2010.  Thus, Plaintiff's remaining timely claims against the Moving Defendants are as follows:

| Entity | Individual | Date of Lookups |
|---|---|---|
| Staples[9] | Ryan Goff | 12/6/2010 |
| Fridley | Perry Jones | 6/28/2011 |

The Court will dismiss Anthony Runde and David Darling from this lawsuit because the claims against them are barred by the statute of limitations.

The parties have not briefed the issue of whether entities may be held liable for time-barred claims against individuals originally named as Doe defendants, and this is apparently an open question.  *See Engebretson*, 2016 WL 5400363, at *7 n.4 (explaining that "[c]ourts are split on this issue"); *see also Potocnik*, 2016 WL 3919950, at *8 (describing this as "an important and complicated issue on which different jurisdictions have adopted different rules").  Absent briefing from the parties on this issue, the Court declines to grant summary judgment to Runde and Darling's employers, the City of Brainerd and the City of St. Cloud, based on the statute of limitations.  *See Rollins*, 2016

---

[9]      In designating Goff's access as attributable to "Staples," the Court does not intend to imply that Staples may properly be held liable for this access instead of Crow Wing County, the entity for which Goff was working at the time he looked up Plaintiff's information.  In light of the Court's analysis regarding qualified immunity below, however, the Court need not reach the issue of which entity may be held vicariously liable for this access.

WL 6818940, at *9.  The Court will therefore consider whether Goff, Runde, or Darling is entitled to qualified immunity for their accesses of Plaintiff's information, below.[10]

## IV.    Qualified Immunity

The Moving Defendants argue that Plaintiff's claims should be dismissed based on qualified immunity.  Plaintiff argues that numerous material fact disputes preclude summary judgment in the City Defendants' favor.

The doctrine of qualified immunity protects state actors from civil liability when their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The defense provides "ample room for mistaken judgments" as it protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986).  "To overcome the defense of qualified immunity, the plaintiff must show:  '(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation.'" *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (citation omitted).  The Court has discretion to decide which qualified immunity prong to consider first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  In determining whether the constitutional right was clearly established at the time of the conduct, the Court must ask whether the contours of the applicable law were "'sufficiently clear' that every 'reasonable official would have understood that what he is

---

[10]    The City Defendants do not argue that Jones is entitled to qualified immunity.

doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). While "[w]e do not require a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Id*.

### A. Clearly Established Right

The City Defendants argue that "[e]ven if the court determines the officers violated the DPPA, at the time of the accesses at issue, it was not clearly established the officers were violating the DPPA." (Doc. No. 378 at 22.) Goff joins the City Defendants' arguments on this issue. Plaintiff asserts that the law was clearly established that viewing a driver's record for personal reasons was impermissible at the time of the accesses in question. The Court agrees with Plaintiff.

It is a violation of the DPPA for a defendant to: (1) knowingly; (2) obtain, disclose, or use personal information; (3) from a motor vehicle record; (4) for a purpose not permitted. *McDonough*, 799 F.3d at 945 (citing 18 U.S.C. § 2724(a)); *Mallak*, 9 F. Supp. 3d at 1051-52, 1055-57. However, there are a number of broadly applied exceptions for which obtaining, disclosing, or using driver's license information *is permitted. See* 18 U.S.C. § 2721(b)(1)-(14) (emphasis added); *Kost v. Hunt*, 983 F. Supp. 2d 1121, 1124-25 (D. Minn. 2013). For example, various governmental and business purposes, such as "use by any government agency, including any court or law enforcement agency, in carrying out its functions," are permissible. *See* 18 U.S.C. § 2721(b)(1).

In this case, the Court concludes that the DPPA and its corresponding statutory rights as applicable to this case were clearly established at the time of Plaintiff's alleged deprivations. That is, the "contours" of the DPPA were "sufficiently clear" at the time of the accesses such that a reasonable official would have understood that accessing data for personal and non-law enforcement purposes violated the DPPA. *al-Kidd*, 563 U.S. at 741 (citation omitted); *see, e.g.*, *Smythe v. City of Onamia*, Civ. No. 12-03149, 2013 WL 2443849, at *5-7 (D. Minn. June 5, 2013) (outlining a number of cases where courts have found DPPA liability "for a personal purpose or for outright misuse" and stating that accessing data out of "personal interest" and not "for a traditional law enforcement function" can constitute a violation of the DPPA). As the Court previously stated, "[t]he DPPA is clear that accessing driver's license information without a permissible purpose violates the law. The DPPA has been in place since 1994. By August 2009, Defendants would have been on notice of the DPPA and its prohibition of the access of driver's license information for impermissible purposes." *Mallak*, 9 F. Supp. 3d at 1063. The Court explained that "if Defendants accessed Plaintiff's data *for an impermissible purpose* as alleged, it was clearly established in 2009 and thereafter, that doing so constituted a violation of the DPPA." *Id.* at 1063-64. This is still true today. Therefore, if the Moving Defendants accessed Plaintiff's information for an impermissible purpose, such as for personal reasons, then they are not entitled to qualified immunity.[11]

---

[11] The Court is not persuaded that the Supreme Court's recent decision in *White v. Pauly*, 137 S. Ct. 548 (2017), involving the application of qualified immunity in the Fourth Amendment context, requires a different result. In *White*, the Supreme Court

(Footnote Continued on Next Page)

## B.      Deprivation of a Constitutional or Statutory Right

The City Defendants assert that Plaintiff cannot establish that Runde or Darling

violated the DPPA because there is insufficient evidence in the record to establish that

they looked up her record for an impermissible purpose.  They emphasize that "[u]nder

the DPPA, an impermissible purpose is an essential element of a plaintiff's case."  (Doc.

No. 378 at 20.)  Goff similarly argues that the record fails to support a finding that he

violated the DPPA, so he is entitled to qualified immunity.[12]  In particular, Goff points

_____

(Footnote Continued From Previous Page)

"reiterate[d] the longstanding principle that 'clearly established law' should not be
defined 'at a high level of generality.'"  *Id.* at 552 (quoting *Ashcroft v. al-Kidd*, 563 U.S.
731, 742 (2011)).  As the Supreme Court noted, the circumstances at issue in *White* did
not present "a case where it is obvious that there was a violation of clearly established
law under [relevant precedent]."  *Id.*  Further, the Court emphasized the Court of
Appeals' failure to "conclude that [the officer's] conduct . . . constituted a run-of-the-mill
Fourth Amendment violation."  *Id.*

In contrast, here, Plaintiff alleges that the Moving Defendants accessed personal
information in her motor vehicle record for personal reasons or out of curiosity.  Such
conduct, if established, would constitute a "run-of-the-mill [DPPA] violation" under the
statute and existing caselaw.  *See id.*; *see also Taylor v. City of Amboy*, Civ. No. 14-0722,
2016 WL 5417190, at *5 (D. Minn. Sept. 27, 2016) ("[A] jury could find that . . .
[defendants] . . . accessed [plaintiff's] DVS record out of curiosity or voyeurism.  No
reasonable officer would have believed that such a purpose is permissible under the
DPPA.").  Thus, *White* is distinguishable, and the Court reiterates its previous conclusion
that Plaintiff has met the clearly-established prong of the qualified immunity analysis
with respect to the claims alleged in this case.  *But see Watts v. City of Miami*, 679 F.
App'x 806, 809 (11th Cir. 2017) ("It is not obviously clear that an officer obtaining the
information for his own use is not within the permissible use of § 2721(b)(1) . . . or of
§ 2721(b)(14).").

[12]      Goff also argues that the lack of evidence to support that he accessed Plaintiff's
record for an impermissible purpose warrants summary judgment in his favor.  Given the
overlapping nature of these issues, the Court addresses this argument in the context of
qualified immunity.  The Court's conclusions, however, would apply equally to support

(Footnote Continued on Next Page)

out that Plaintiff and Goff did not know one another and that none of the general reasons why officers may have had personal curiosity or interest in Plaintiff apply to him.

Plaintiff asserts that the record supports that there is a genuine issue of material fact over whether officers Runde, Darling, and Goff accessed her record for a legitimate and permissible law-enforcement purpose. Further, Plaintiff asserts that "[t]he facts revealed in discovery indicate that there could be no legitimate law-enforcement purpose and that curiosity was the likely purpose." (Doc. No. 391 at 36-37.)

The Court has previously evaluated a summary judgment motion by a number of the Moving Defendants in this case. *See Mallak v. City of Baxter*, Civ. No. 13-2119, 2015 WL 13187115 (D. Minn. Mar. 19, 2015). This motion was brought "prior to any meaningful discovery, including depositions." *Id.* at *7. At that time, the Court determined that granting summary judgment based on qualified immunity would be "premature" with respect to Defendants Runde, Jones, Darling, and Goff. *See id.* For these Defendants, the Court disagreed "that the undisputed facts show[ed] that Plaintiff's records were accessed for a permissible purpose." *Id.* at *6-7.

In evaluating the City Defendants' interlocutory appeal of the Court's denial of qualified immunity, the Eighth Circuit determined that "the record includes several facts indicating that each officer might have accessed [Plaintiff's] data for an improper purpose." *Mallak v. City of Baxter*, 823 F.3d 441, 446 (8th Cir. 2016). First, the record

---

(Footnote Continued From Previous Page)
the conclusion that Goff is entitled to summary judgment dismissal based on insufficient evidence to support Plaintiff's DPPA claim against him.

contained facts suggesting "that [Plaintiff] may have had some prior relationship with" Jones, Runde, and Goff. *See id.* at 446-47. Second, Darling's access of Plaintiff's record "correspond[ed] with a significant event," namely Plaintiff's son's hospitalization in St. Cloud. *See id.* at 447 (quoting *McDonough*, 799 F.3d at 947). Further, the Eighth Circuit pointed out that "none of the officers offered a definitive explanation for why they accessed Mallak's data." *Id.* Thus, the court determined that "[t]he record does not foreclose the possibility that the officers accessed [Plaintiff's] data for a purpose not permitted by the DPPA," and concluded that it lacked jurisdiction over the interlocutory appeal. *Id.* at 448. Since this decision, discovery has revealed additional facts that alter the Court's analysis of the qualified immunity issue.

With respect to the following accesses, the Court concludes that the facts, viewed in the light most favorable to Plaintiff, fail to create a genuine dispute over whether these Defendants violated Plaintiff's statutory rights under the DPPA:

| Entity | Individual | Date of Lookups |
|---|---|---|
| St. Cloud | David Darling | 7/11/2010 |
| Staples | Ryan Goff | 12/6/2010 |

The Moving Defendants have sufficiently established that there is no genuine issue of material fact regarding the reasons for these accesses. No reasonable jury could find that the accesses were made for an impermissible purpose because the record fails to raise a genuine dispute over the permissibility of the accesses in question. Thus, these Moving Defendants are entitled to summary judgment based on qualified immunity.

In its February 1, 2017 Order in this case, the Court concluded that summary judgment in favor of a defendant was warranted where the record lacked sufficient evidence to support that her lookup was conducted for an impermissible purpose. *See Mallak*, 2017 WL 440249, at \*12. Summary judgment was proper in this circumstance because "a jury would be forced to speculate that [the defendant's] access was impermissible." *Id.* As the Court explains below, the Court's analysis and conclusion with respect to this defendant applies equally to Defendants Goff and Darling here.

Goff accessed Plaintiff's DVS record while at work in the Crow Wing County Jail during his typical overnight shift. He testified that he did not know Plaintiff and had not heard of her son's death. Plaintiff similarly testified that she did not know Goff other than suggesting that she might recognize him if she saw him. In other words, the parties do not dispute that Plaintiff and Goff had no personal or professional relationship. Thus, the factual basis that previously supported an inference of an impermissible purpose has now been foreclosed in discovery. Furthermore, Goff's access of Plaintiff's information was not tied to a particular event that would support an inference that Goff looked up Plaintiff for personal reasons. Although Goff does not know with certainty that the woman he recalls encountering at the jail was in fact Plaintiff, this does not create a genuine issue of material fact. Even if Goff's recollection is incorrect and he did not look up Plaintiff's record to verify her identity that night, there is simply no evidence in the record by which a jury could reasonably conclude that Goff's December 6, 2010 access of Plaintiff's DVS record was conducted for personal reasons or out of curiosity. Thus, Goff is entitled to qualified immunity.

Although it is perhaps a closer question, the Court also concludes that the record does not support a reasonable inference that Darling accessed Plaintiff's DVS record on July 11, 2010 for an impermissible purpose. Darling's lookup of Plaintiff's information was conducted close in time to "a significant event," Plaintiff's son's hospitalization under unusual circumstances. *See Mallak*, 823 F.3d at 447 (quoting *McDonough*, 799 F.3d at 947). This fact would be sufficient to establish a plausible claim at the pleading stage, and the Court determined that it was enough to survive an early summary judgment motion prior to any meaningful discovery. At this stage, however, and in light of the existing record, this fact alone cannot reasonably support a finding that Darling has violated Plaintiff's rights under the DPPA through an impermissible access of her DVS record. Darling testified that he did not know Plaintiff and had not heard about her son's hospitalization. Mallak also testified that she did not know Darling. The City of St. Cloud was not involved in the investigation of Plaintiff's son's death, and Plaintiff has not identified any evidence to indicate that this event was reported generally within the City of St. Cloud or known throughout the city's law enforcement community. *Compare Engebretson*, 2016 WL 5400363, at *2, *9-10 (denying qualified immunity to an officer whose access took place on the same day that an event involving the plaintiff was reported in an article online). To support an inference of an impermissible purpose, a factfinder would be required to speculate that Darling had heard of Plaintiff and the circumstances of her son's hospitalization. Considered against Darling's testimony that

he had never heard of Plaintiff or her son, such speculation is insufficient to preclude summary judgment.[13]

Defendants are entitled to qualified immunity for these accesses because there is no deprivation of a statutory right and, as a result, Plaintiff's claims are dismissed as to these accesses. The Court will therefore dismiss Defendants Darling, Goff, the City of Staples, and the City of St. Cloud from this lawsuit.

However, with respect to the following accesses, the Court agrees with Plaintiff that a genuine issue of material fact exists regarding whether her record was accessed for a purpose not permitted:

| Entity | Individual | Date of Lookups |
|--------|-----------|-----------------|
| Brainerd | Anthony Runde | 9/8/2009 |

In this instance, the City Defendants have failed to show that the undisputed facts preclude a finding that Plaintiff's record was accessed for an impermissible purpose.

At the time of the access in question, Runde knew Plaintiff based on their work together on the DWI Court Team, and Runde knew that Plaintiff resigned from the DWI Court Team based on her relationship with S.M.S. Notably, Runde accessed Plaintiff's record just over one week following her resignation. Runde proposed multiple possible

---

[13] The Court also notes that the facts developed in discovery indicate that Darling looked up Plaintiff's DVS record immediately following a lookup of a license plate associated with Plaintiff's Honda Accord. Plaintiff acknowledged that S.M.S. was driving her Honda Accord while Plaintiff's son was in the hospital. These facts further undermine the reasonableness of any inference that Darling accessed Plaintiff's DVS record out of curiosity because he had heard about her son's hospitalization.

reasons for looking up Plaintiff's record, but there is no documentation to support any of his proffered reasons. In addition, the evidence indicates that he looked up S.M.S. and S.M.S's ex-wife within minutes of accessing Plaintiff's record. While this fact could be consistent with Runde's proffered investigatory justification for accessing Plaintiff's DVS record, it could also support the inference that Runde was looking up all of these individuals out of personal curiosity. Based on Runde's professional relationship with Plaintiff, his knowledge of her relationship with S.M.S., the timing of his access, and his failure to definitively establish a law-enforcement reason for his access, a jury could reasonably conclude that Runde looked up Plaintiff's information for an impermissible purpose in violation of the DPPA.

In sum, on the record before the Court, Plaintiff could overcome qualified immunity by establishing that Runde violated her clearly established rights under the DPPA. Thus, summary judgment is not appropriate on this basis for Runde or the City of Brainerd.

## V. Rule of Lenity

The City Defendants contend that the Court must apply the rule of lenity in interpreting the DPPA's government functions exception based on ambiguity in the statute's reference to "use by any government agency . . . in carrying out its functions." *See* 18 U.S.C. § 2721(b)(1). Plaintiff argues that the rule of lenity does not apply because the statute is not ambiguous.

"[T]he rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the

Court must simply guess as to what Congress intended." *See Maracich v. Spears*,

133 S. Ct. 2191, 2209 (2013) (quoting *Barber v. Thomas*, 560 U.S. 474, 488 (2010)).  In

*Maracich*, the Supreme Court evaluated whether attorneys' use of personal information

from motor vehicle records to solicit potential clients fell under the DPPA's litigation

exception.  *See id.* at 2199.  That exception, contained in 18 U.S.C. § 2721(b)(4), permits

use of personal information "in connection with any civil, criminal, administrative, or

arbitral proceeding" as well as for "investigation in anticipation of litigation."  *See id.*

(quoting 28 U.S.C. § 2721(b)(4)).  The Supreme Court construed the statute according to

its text and overall structure and determined that the exception did not extend to permit

use of personal information by attorneys seeking to solicit clients.  *Id.* at 2199-2209.  The

Court declined to apply the rule of lenity, explaining that "[t]here is no room for the rule

of lenity where the text and structure of the DPPA require an interpretation of (b)(4) that

does not reach out to include an attorney's solicitation of clients."  *Id.* at 2209.

Likewise, here, the Court concludes "[t]here is no room for the rule of lenity," *id.*,

because the statute's text contains no grievous ambiguity over whether accessing an

individual's record for personal reasons or curiosity constitutes "use by any government

agency . . . in carrying out its functions."  *See* 18 U.S.C. § 2721(b)(1).  "[A]s a matter of

normal usage and common understanding," the text plainly forecloses the application of

this exception to such purposes.  *See Maracich*, 133 S. Ct. at 2204; *see also Rollins*, 2016

WL 6818940, at *15 (questioning whether the rule of lenity applied, but concluding that

it nevertheless did not support summary judgment dismissal because "an officer's access

of a driver's information based on curiosity or other personal reasons cannot be in

furtherance of a government function"); *Engebretson*, 2016 WL 5400363, at *10 ("[T]here is no ambiguity that accessing a motor vehicle record to satisfy personal curiosity does not constitute a government or law enforcement function.").  While there may be some circumstances where the application of § 2721(b)(1)'s government function exception results in grievous ambiguity, the Court concludes that this is not such a case.

## VI. City Defendants' Liability

The City Defendants argue that they have no direct or vicarious liability for the alleged improper accesses of Plaintiff's information.  Plaintiff, on the other hand, asserts that the City Defendants are both directly and vicariously liable.  The Court evaluates these issues with respect to the City of Brainerd (Runde's employer), and the City of Fridley (Jones' employer), below.[14]

### A. Direct Liability

The City Defendants argue that they should not be held directly liable under the DPPA because the record lacks evidence to suggest that the entities themselves accessed Plaintiff's information for an impermissible purpose.  Plaintiff argues that the DPPA permits direct liability against cities and that such liability against the City Defendants is warranted because the entities provided access credentials without proper monitoring.

As the Court concluded in its February 1, 2017 Order, "Plaintiff fails to present facts to establish that the [City Defendants] knowingly obtained, disclosed, or used her DPS record for an impermissible purpose."  *Mallak*, 2017 WL 440249, at *14.  The Court

---

[14]    Because the Court has concluded Goff is entitled to qualified immunity, it does not address the parties' arguments relating to the City of Staples' liability for his access.

adopts its previous analysis and conclusion on this issue, *see id.*, and concludes that the City Defendants may not be held directly liable under the DPPA under the circumstances in this case.

## B. Vicarious Liability

The City Defendants further assert that they should not be held vicariously liable because such liability would be inconsistent with the DPPA's purposes, and even if such a theory or relief is viable, the record does not support vicarious liability. In particular, they argue that they should not be held vicariously liable for officers' accesses where they are outside the scope of employment. Plaintiff asks the Court to follow courts outside of this District that have consistently imposed vicarious liability on employers under the DPPA. Further, Plaintiff urges the Court to apply federal common law rather than Minnesota law on this issue and suggests that imposing vicarious liability will advance the purposes of the DPPA.

Again, the Court adopts and incorporates the analysis in its February 1, 2017 Order on this issue. *See id.* at *15-17. Specifically, "because a fact-finder could conclude that [Runde and Jones] were 'aided in accomplishing the tort by the existence of the agency relation,' Restatement (Second) of Agency § 219(2)(d), the Court concludes that [the Cities of Brainerd and Fridley] are not entitled to summary judgment on vicarious liability." *Mallak*, 2017 WL 440249, at *17. The record indicates that both Runde and Jones accessed Plaintiff's personal information in her DVS record while on patrol in their squad cars using computers and passwords provided by their respective

employers, the City of Brainerd and the City of Fridley. Thus, the Court concludes that these cities may be held vicariously liable for these accesses under the DPPA. *See id.*

## VII.   Punitive Damages

The City Defendants argue that punitive damages should not be permitted against municipalities as a matter of law. In their reply brief, the City Defendants further argue that the Court should hold that there is insufficient evidence to impose punitive damages against Runde, Darling, and Jones. Goff also argues that the record does not support imposing punitive damages against him in this matter. Plaintiff argues that the DPPA supports imposing punitive damages against municipalities and suggests that a jury should be permitted to evaluate punitive damages against the City Defendants as well as Jones, Runde, Darling, and Goff.

The Court first addresses the Moving Defendants' argument that punitive damages are unavailable against municipalities as a matter of law. The DPPA provides that "[a] person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains." 18 U.S.C. § 2724(a). Further, the statute provides that "[t]he court may award . . . punitive damages upon proof of willful or reckless disregard of the law." *Id.* § 2724(b)(2). A "person" within the meaning of the DPPA includes "an individual, organization or entity, but does not include a State or agency thereof." *Id.* § 2725(2).

In *City of Newport v. Fact Concerts, Inc.*, the Supreme Court held that punitive damages may not be awarded against municipalities under 42 U.S.C. § 1983. *See* 453

U.S. 247, 271 (1981). The Supreme Court considered the common law, legislative history, and public policy, and concluded "that considerations of history and policy do not support exposing a municipality to punitive damages for the bad-faith actions of its officials." *Id.* It explained that "punitive damages imposed on a municipality are in effect a windfall to a fully compensated plaintiff, and are likely accompanied by an increase in taxes or a reduction of public services for the citizens footing the bill." *Id.* at 267. According to the Supreme Court, "[n]either reason nor justice suggests that such retribution should be visited upon the shoulders of blameless or unknowing taxpayers." *Id.* More recently, the Supreme Court has reiterated this rationale and noted that in *Newport*, it was "concerned with imposing punitive damages on taxpayers under any circumstances." *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 785 n.15 (2000). Indeed, "[s]ince municipalities' common law resistance to punitive damages still obtains, '[t]he general rule today is that no punitive damages are allowed unless expressly authorized by statute.'" *Cook County, Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003) (quoting *Newport*, 453 U.S. at 260 n.21).

Courts have extended *Newport* to prohibit the imposition of punitive damages against cities under other federal statutes, including the DPPA. *See Senne v. Village of Palatine*, Civ. No. 10 C 5434, 2013 WL 68703, at *2-3 (N.D. Ill. Jan. 4, 2013) (finding no express abrogation of the common-law rule prohibiting punitive damages against municipalities in the DPPA); *A.M.J. v. Royalton Pub. Sch.*, Civ. No. 05-2541, 2006 WL 3626979, at *2 (D. Minn. Dec. 12, 2006) ("Plaintiff may not recover punitive damages from the municipal Defendants under Title VI, Title IX, or § 1983."); *Morlock v. W.*

*Cent. Educ. Dist.*, 46 F. Supp. 2d 892, 923-24 (D. Minn. 1999) (applying *Newport* to claims under Title IX and dismissing the plaintiff's punitive damages claim). After noting the common law rule disfavoring punitive damages against municipalities, the court in *Senne* considered the relevant provisions of the DPPA and determined that "[t]he DPPA does not 'speak directly' to a plaintiff's ability to collect punitive damages from a municipality." *Senne*, 2013 WL 68703, at *2-3. The Court agrees.

Plaintiff asks the Court to conclude that the DPPA permits punitive damages against municipalities because the statute's definition of a "person" who may be held liable under the statute does not exclude municipalities, and because the remedies portion of the statute permits the imposition of punitive damages. Plaintiff contends that if Congress wanted to exclude the imposition of punitive damages against cities, it would have said so. However, adopting Plaintiff's argument would require the Court to apply the opposite presumption that the Supreme Court has held applies in this circumstance. If Congress wanted punitive damages to be available against municipalities under the DPPA, it must have "expressly authorized" them in the statute. *See Cook County, Ill.*, 538 U.S. at 129 (citation omitted). Since the statute contains no such express authorization, the Court concludes that punitive damages are not available against municipalities under the DPPA. Thus, City Defendants' motion is granted on this issue.

Next, the Court considers the Moving Defendants' arguments that the record precludes the imposition of punitive damages against the individual officers because there is insufficient evidence to support that they acted in willful or reckless disregard of the law. The City Defendants raised this argument in their reply brief, and Goff was the

only Moving Defendant to initially move for summary judgment on this issue.  In light of the Court's analysis, above, Goff will be dismissed as a defendant based on qualified immunity.  In addition, Runde and Darling will be dismissed based on the statute of limitations.  Thus, the only remaining Moving Defendant against whom punitive damages may be imposed is Jones.

Plaintiff argues that a jury should be permitted to assess punitive damages with respect to Jones because the record indicates that he "understood that [he was] not to access drivers' license information for personal reasons."  (Doc. No. 391 at 53-54.)  In their reply brief, the City Defendants ask the Court to "extend its recent holding there is no evidence to support punitive damages against the County individuals to the claim[] against . . . Jones."  (Doc. No. 395 at 5.)  Given the fact-specific inquiry necessary to determine whether to permit the punitive damages issue to proceed to trial, and because this issue was not raised by the City Defendants in their opening brief, the Court declines to grant summary judgment to the City Defendants on this issue.[15]

## CONCLUSION

Because Plaintiff's First Amended Complaint does not relate back to the filing of her original Complaint, Defendants Runde and Darling are properly dismissed based on

---

[15]    The Court, however, reiterates the statement in its February 1, 2017 Order noting that "the statute's text does support the requirement that a defendant at least know that his actions are *unlawful*—not merely against employer policies or rules."  *Mallak v. City of Brainerd*, Civ. No. 13-cv-2119, 2017 WL 440249, at *19 n.16 (D. Minn. Feb. 1, 2017); *see also* 18 U.S.C. § 2724(b)(2) ("The court may award . . . punitive damages upon proof of willful or reckless disregard of the law.").  The Court reserves the right to limit the scope of available damages against Jones as this matter proceeds.

the statute of limitations.  Furthermore, qualified immunity precludes liability against Defendants Goff, the City of Staples, and the City of St. Cloud.  For these Defendants, the record contains insufficient evidence from which a jury could reasonably infer that Plaintiff's information was accessed for an impermissible purpose.  However, the Court concludes that the cities of Brainerd and Fridley may be held vicariously liable for Runde and Jones' conduct.  As a matter of law, however, punitive damages may not be awarded against the municipalities.  In light of this order, Plaintiff's claims relating to the following accesses will proceed to trial:  the September 8, 2009 lookup (against the City of Brainerd only); the June 28, 2011 lookup (against both Jones and the City of Fridley).

## ORDER

Based on the files, record, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     The City Defendants' Motion for Summary Judgment (Doc. No. [376]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

a.     The Motion is **GRANTED** with respect to DPPA claims that relate to lookups that occurred before November 5, 2010 (for Defendants first named in the First Amended Complaint).  Such claims are **DISMISSED WITH PREJUDICE**.

b.     In light of 1(a), above, the following Moving Defendants are **DISMISSED** from this lawsuit:  Anthony Runde and David Darling.

c.     The Motion is **GRANTED** with respect to Plaintiff's DPPA claim relating to the July 11, 2010 access by Defendant David Darling, and this claim is **DISMISSED WITH PREJUDICE**.

d.     In light of 1(c), above, Defendant the City of St. Cloud is **DISMISSED** from this lawsuit.

e.     The Motion is **GRANTED** with respect to the issues of the entities' direct liability and the availability of punitive damages against the municipalities.

f.     Consistent with the Court's Memorandum Opinion, above, the Motion is otherwise **DENIED**.

2.     Defendant Ryan Goff's Motion for Summary Judgment (Doc. No. [383]) is **GRANTED** as follows:

a.     Plaintiff's DPPA claim relating to the December 6, 2010 access by Defendant Ryan Goff is **DISMISSED WITH PREJUDICE**.

b.     In light of 2(a), above, Defendant Ryan Goff is **DISMISSED** from this lawsuit.

3.     In light of the Court's conclusion that Ryan Goff is entitled to qualified immunity for his December 6, 2010 access of Plaintiff's information, Plaintiff's DPPA claim against the City of Staples is **DISMISSED WITH PREJUDICE**, and Defendant the City of Staples is **DISMISSED** from this lawsuit.

Dated:  August 23, 2017                   s/Donovan W. Frank
                                          DONOVAN W. FRANK
                                          United States District Judge